# In the United States Court of Federal Claims

Filed March 21, 2012
(Previously Filed **Under Seal** March 1, 2012)

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | No. 07-876 C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, | ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | No. 07-875 C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |
| MAINE YANKEE ATOMIC POWER COMPANY, | ) ) | |
| Plaintiff, | ) | No. 07-877 C |
| v. | ) ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## ORDER on Motion to Compel and Scheduling Order[1]

Trial proceedings were held in these Phase II cases on October 11-13, 2011. The possibility of additional evidence and attendant argument remains because of claimed tardy and inadequate responses to discovery requests by Connecticut Yankee

---

[1] This Order was originally filed under seal on March 1, 2012. The parties were given until March 12, 2012, to propose redactions by motion or stipulation prior to the Order being filed in the public record. No redactions were proposed by the parties. Thus, the sealed and public version of the Order are identical except for the publication date, this footnote, and some minor, non-substantive edits.

Atomic Power Company ("CY") and Maine Yankee Atomic Power Company ("MY") detailed in the court's Order of October 18, 2011.  (CY/ECF No. 89, MY/ECF No. 77.)  No post-trial briefing schedule was then established pending further attempts to resolve these matters.  Nevertheless, Motions to Compel were subsequently filed, CY/ECF No. 99, MY/ECF No. 84, as were Oppositions and Replies.

## Background

Defendant asserts that plaintiffs have not fully complied with requests for production of documents relating to CY and MY's disputes with, and recoveries from, Bechtel Power Corporation ("Bechtel") and Stone & Webster Engineering Corporation ("SWEC"), respectively.  Bechtel and SWEC were retained to build and load the dry storage facilities for spent nuclear fuel ("SNF") necessitated by DOE's failure to perform its contractual obligation to remove this SNF.  Both the SWEC and Bechtel contracts also included decommissioning the nuclear power plants, which involves dismantling the reactors and associated structures and restoring the property – substantial efforts.  Bechtel and SWEC were terminated, requiring CY and MY to hire replacement contractors and self-perform or otherwise accomplish what Bechtel and SWEC had contracted to do, all at a cost in excess of the Bechtel and SWEC contract amounts.  The costs incurred by CY and MY to construct the dry storage facilities comprise sums sought in this action as damages for DOE's breach.

The SWEC contract involved:

> both decommissioning and ISFSI [Independent Spent Fuel Storage Installation – dry storage] construction work at the [MY] plant for a total adjusted fixed price of $252.6 million, approximately $195.3 million of which related to decommissioning and $57.3 million related to ISFSI construction.  Subsequently, SWEC fell behind on the work, encountered numerous difficulties, including changing regulations, became insolvent, and defaulted on its obligation.  On May 4, 2000, [MY] terminated the contract and commenced self-performance. . . . The actual cost of [MY's] subsequent decommissioning activities alone was $324.8 million, $129.5 million more than the original SWEC contract price.

(Pls.' Pretrial Mem. 8, MY/ECF No. 57.)

MY sued SWEC and Federal Insurance Company ("Federal"), SWEC's bonding company, for costs consequent to SWEC's default.  In January 2002 (the Phase I claims period), MY recovered $44 million from Federal, which MY credited towards decommissioning costs.   Despite defendant's contention some of the settlement should have been credited to ISFSI construction, in *Yankee I*, the court upheld the allocation of the entire $44 million to decommissioning which was driven by favorable tax consequences, in the best interests of the ratepayers.  *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 323 (2006).  Defendant does not suggest that it appealed that finding nor that it was disturbed on appeal by the Federal Circuit.

Also during the Phase I claims period, in May 2002, the United States Bankruptcy Court for the District of Delaware determined that MY's termination of the SWEC contract was justified, and that MY was entitled to an additional $20.8 million in damages due to the breach, which together with the initial $44 million, resulted in a total award of $64.8 million.  *In re Stone & Webster, Inc.*, 279 B.R. 748 (Bankr. D. Del. 2002).[2]

> In January 2004, the bankruptcy court approved a plan of reorganization for SWEC that, in turn, approved a settlement agreement between the SWEC bankruptcy estate and [MY]. . . .  Pursuant to that agreement, the SWEC bankruptcy estate made payments to [MY] in excess of $17 million during the Phase II period ending December 31, 2008.

> Of the $17 million in SWEC proceeds recovered during the Phase II period, [MY] allocated $11.6 million to decommissioning costs, and the remaining $5.4 million to ISFSI construction costs.  This allocation followed an internal [MY] calculation establishing a cap for the portion of SWEC proceeds attributable to decommissioning at $55.6M.[3]  The entire $5.4 million allocated to ISFSI construction costs has been credited as an offset against [MY's] Phase II claim.

(Pls.' Pretrial Mem. 9, MY/ECF No. 57 (footnote added).)

---

[2] In a footnote, the Bankruptcy Court cited confidence that counsel would not seek double recovery in litigation with DOE.  279 B.R. at 811 n.37.  The Opinion also described both the initial $44 million and the additional $20.8 million as damages for breach of the "Decommissioning Agreement."  279 B.R. 748 *passim*.

[3] "[MY's] breach of contract damages are capped at $65 million, pursuant to section 30.2 of the Agreement."  279 B.R. at 792 (citing a November 21, 2000 memorandum opinion).

MY states that "its decision to terminate the SWEC contract, its subsequent settlements with Federal and the SWEC bankruptcy estate, and its allocation decisions concerning the recovered proceeds were subject to review and approval by the Federal Energy Regulatory Commission ("FERC")." (*Id.*)  MY also represents that all costs related to MY's self-performance and use of subcontractors to complete the ISFSI construction following SWEC's termination were reviewed and approved by FERC. *Maine Yankee Atomic Power Co*., Certification of Uncontested Offer of Settlement, 108 FERC ¶ 63,021 at ¶ 13, 2004 WL 1803225 (Aug. 12, 2004); *Maine Yankee Atomic Power Co*., Order Approving Settlement, 108 FERC ¶ 61,241, 2004 WL 2067962 (Sept. 16, 2004).

The ISFSI construction at each plant was previously determined to have been caused by DOE's failure to perform, and would not have been built in the non-breach world had DOE removed SNF at the 1987 ACR acceptance rates.  Also, the Bechtel and SWEC contracts included decommissioning, shutting down and dismantling of both CY and MY's nuclear power plants for business reasons independent of DOE's breach.   Problems arose; breaches were declared; and litigation commenced. Defendant questions whether its liability for damages for breach of its SNF removal contract with the utilities extends to second-tier or secondary breaches of collateral contracts which may increase plaintiffs' costs.  Also questioned is whether claimed damages are too remote to be either foreseeable or to be caused by DOE's primary underlying breach and whether costs claimed are too uncertain.  Defendant also focuses on the settlement of the Bechtel and SWEC litigations and respective allocation of settlement proceeds between dry storage and decommissioning, contending that settlements could have been larger and more of the settlement proceeds allocated to ISFSI costs, which would reduce the damages claimed by plaintiffs.

For the purposes of the Motions to Compel, defendant does not contest that its breach of the SNF removal contracts caused MY and CY to retain these mitigation contractors and build the ISFSIs which would not have occurred had DOE timely commenced SNF removal at the 1987 ACR rates.  Also uncontested is that the SWEC and Bechtel contracts were ultimately terminated with the utilities doing some of the work themselves and hiring contractors, subcontractors, and the like which resulted

in expenditures exceeding the original SWEC and Bechtel contract prices.[4] While it may have been foreseeable that plaintiffs would have to contract to build dry storage as a consequence of the DOE's failure to perform, defendant asserts that it was not foreseeable that those contractors would in turn default, resulting in increased costs of substitute performance. It is those costs, or at least MY and CY's internal assessment of those additional costs, that defendant is trying to ascertain in connection with, or in addition to, defendant's attempts to contest the allocation of recoveries between ISFSI construction and decommissioning.

Defendant asserts:

> [C]onsequential damages associated with a purchaser's inability to "cover" following a breach are recoverable only if the inability to cover is itself foreseeable. *See* Restatement (Second) of Contracts § 351 cmt. d ("[i]f several circumstances have contributed to cause a loss, the party in breach is not liable for it unless he had reason to foresee all of them."). Construction costs overruns can be deemed to be foreseeable to the Government only if the individual circumstances that contributed to them – be it the contractor's negligence or some other intervening event – are themselves proven (by the plaintiffs) to have been foreseeable to the Government. To the extent that they are not so proven, they are not proximately caused by the Government's breach and are, therefore, unrecoverable as a matter of law. In any event, even if foreseeable, the Government should not be held liable for costs caused by a third party when that third party could, and should, have been accountable for them. The mere fact that plaintiffs have a contract with the Government does not mean that they can simply impose every cost overrun upon the Government regardless of its cause and can simply excuse the party primarily responsible for the costs. If they could, they would have no incentive even to try to be reasonable with their cost expenditures, to monitor their own contractors' work adequately, and to hold their own contractors accountable for their own breaches of contract, knowing that they can just get the money from the Government.

---

[4] Claimed security law violations against SWEC included the failure to disclose that SWEC had underbid the MY project and would lose money on it. *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 118 (D. Mass. 2003).

(Def.'s Reply Pls.' Opp'n Mot. Compel 6-7 n.2, CY/ECF No. 108, MY/ECF No. 93.)[5/]

The goal of defendant's Motion to Compel, in addition to further document production, is an opportunity to develop and present additional evidence to be added to the record "regarding increased ISFSI construction costs and improperly withheld credits at further proceedings after we complete discovery on the issues." (*Id.* at 2.)

## Contentions concerning MY

### Document production

In addition to items produced, defendant contends that it is reasonable to expect that MY has the following:

- Responsive letter requested in DX6098 and any analysis determining the extent to which [MY's] claims were duplicative.
- All of the analyses conducted by NAC and [MY] estimating the higher cost to complete dry storage

---

[5/]   Defendant also contends:

The Government should not be held responsible for the increased costs that CY and MY incurred to construct their ISFSIs to the extent those costs are not attributable to or did not result from the delay by the [DOE] in accepting [SNF] from their sites. In this respect, CY and MY cannot recover their increased ISFSI construction costs as damages because the increased costs (1) were not foreseeable to DOE at the time it entered the Standard Contracts with CY and MY; (2) have not been and cannot be established with reasonable certainty; and (3) were not caused by DOE's breach of the Standard Contracts. Similarly, CY and MY cannot recover damages for increased ISFSI construction costs because they experienced increases in costs as a result of their own unreasonable mitigation efforts to avoid loss. As a corollary, both CY and MY improperly failed to credit against their overall damages claims amounts that they received as settlement proceeds from the resolution of their litigation with their respective original ISFSI construction contractors, Bechtel and SWEC.

(Def.'s Mot. Compel 3, CY/ECF No. 99, MY/ECF No. 84.)

project, including the analysis referenced in DX6132
at MYIM00014331.

•        All of the documents referenced in the privilege log
         dated January 10, 2001 Privilege Log at
         MY0215412-418.

(Def.'s Mot. Compel 17, MY/ECF No. 84.)

MY responds that if any of these documents exist, they would have been in the approximately 170 boxes previously made available to defendant for review in response to document requests, from which defendant requested and received copies from seventy-eight of those boxes, comprising about 48,000 pages. (Pls.' Opp'n Mot. Compel 2, MY/ECF No. 91.)

Pursuant to RCFC 34, a party may serve on any other party a request to produce designated documents regarding any matter, not privileged, relevant to the claim or defense of any party in the given dispute.  RCFC 26(b), 34(a).  The party producing the documents for inspection may present them as they are kept in the ordinary course of business **or** the party can organize and label them to correspond with categories in the request.  RCFC 34(b).  Apparently, MY produced the files containing potentially responsive documents.  Defendant did not and does not object to this mass production.  *See Dairyland Power Coop. v. United States*, 79 Fed. Cl. 722, 728-29 (2007) (discussing RCFC 34 and production of a large number of documents for inspection by the propounding party (citing *Renda Marine, Inc. v. United States*, 58 Fed. Cl. 57, 64 (2003)).  No authority has been cited that would require MY to do this again.

[MY] retained copies of the voluminous files complied in connection with its dispute with SWEC.  Long prior to trial, [MY] produced all of those files and documents, except those withheld on the grounds of the attorney-client privilege and/or as attorney work product . . . which the Government inspected and from which the Government long ago selected what it wanted to copy and what it did not want to copy.

(Pls.' Opp'n Mot. Compel 2, MY/ECF No. 91 (citation omitted).) In its Reply, defendant comments that these files were "stored" in counsel's office. (Def.'s Reply 3, MY/ECF No. 93.)

It is presumed that the files "compiled" in connection with MY's dispute with SWEC had their origin in a fulsome search of internal MY files, and are either originals or copies previously determined to be relevant to, or within the scope of, discovery requests in prior litigation or other proceedings with SWEC. MY's present counsel was also MY's counsel in the prior litigation. Accordingly, counsel's representation that all documents have been produced is so understood. If this is not accurate, counsel shall so state and detail in post-trial briefing established herein. With that assumption, there is no indication that counsel have not proceeded in good faith, nor that all MY files that may contain requested documents were not made available to defendant for inspection and copying, which has been accomplished. No second peak at the files is justified nor requested. MY is not required to go through the records and look for what defendant may have overlooked or belatedly realized might be probative and defendant cites no authority that would require such.[6]

Assuming any deficient contract performance by SWEC has legal relevance (a matter that has not been determined in the instant proceeding), SWEC's work, breach, and mitigation costs were vented through vigorous, contested administrative and

---

[6] MY represents:

> The Government in its motion claims that it cannot find in the documents it chose to copy a few documents that it believes likely existed at some time. As an example, in its Motion the Government asks for the production of a letter responding to DX6098, which was a letter from opposing counsel to counsel for [MY]. Motion at 17; Wycoff Decl. at ¶ 10. Neither [MY] nor the Government knows if a responding letter exists. Id. at ¶ 11. If one does exist, it would have been produced to the Government in the over 170 boxes of documents the Government's lawyers reviewed. If the Government chose not to obtain a copy of it, when it was produced to the Government, [MY] cannot be faulted for that. So, too, for anything else the Government says that it would like: if Maine Yankee is aware of it, it produced it long ago in the documents reviewed by the Government or included it on its privilege log.

(Pls.' Opp'n Mot. Compel 3, MY/ECF No. 91.)

bankruptcy proceedings.  Recovery was far less than MY's expenses consequent to the termination so there is no apparent windfall, MY concludes.  In this Phase II case, like its predecessor, extensive pretrial informal audit procedures were ordered and plaintiff produced invoices and backup data for all costs in excess of $5,000 sought to be recovered.  Supporting documents were provided and available to defendant's witnesses.  These costs were vigorously vetted in the SWEC bankruptcy proceedings, where the debtor as well as other creditors had every incentive to minimize MY's claims.  FERC proceedings, which included review, input and advocacy of agency staff,[7] ratified the prudency of MY's mitigation decisions and expenditures which encompassed costs MY seeks in the Phase II proceedings.  *See System Fuels, Inc. v. United States*, 666 F.3d 1306, 1312 (Fed. Cir. 2012) (citing FERC-mandated accounting procedures).  Evidence of and about MY's claim and SWEC's work were and are publicly available.

Also, defendant could (and may) have invoked RCFC 30(b) to obtain MY representatives' depositions as to their knowledge in this regard.  Defendant examined invoices and underlying efforts or materials for foreseeability, causation, reasonable certainty, and the like.  Indeed, one of defendant's experts, Warren K. Brewer, of ABZ, Inc., reviewed plaintiff's documentation regarding the activities for which costs were claimed based on his expertise as a consulting engineer to the commercial nuclear power industry.  He relied upon documents provided by the plaintiffs, deposition transcripts, and publicly-available documents.  (Trial Tr. 393, YA/ECF No. 88.)  Defendant's economic expert, R. Larry Johnson, CPA, identified costs unrelated to DOE's breach, costs that would have been incurred regardless of the breach, or were avoided because of the breach.  Mr. Johnson's expert report includes a voluminous list of categories of documents produced by plaintiffs.  He also considered Mr. Brewer's opinion.  Mr. Johnson calculated some $21.2 million in

---

[7]   Although not expressly presented, the reasonableness of MY's decisions and the costs thereof, approved in administrative proceedings with input from another federal agency, may have res judicata or collateral estoppel consequences.  *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402-03 (1940) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government."); *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966) (applying res judicata to decisions of an administrative agency acting in a "judicial capacity"); *Underwood Livestock, Inc. v. United States*, 89 Fed. Cl. 287, 300-02 (2009) (holding taking claim was barred by collateral estoppel of a prior decision of an administrative agency), *aff'd*, 417 Fed. App'x 934 (Fed. Cir. 2010).

reductions which included an eight million dollar credit for what he referred to as a disproportionate allocation of SWEC settlement proceeds. (*Id*. at 463-619.)

Indeed, trial testimony dissected significant work and attendant costs, contesting, for example, whether costs would have been incurred absent the government's breach. And, as noted, adversarial administrative proceedings as to the reasonableness and prudency of MY's decisions were extensive. In sum, discovery of costs incurred and sought in this action, and the efforts underlying those costs were fulsome. Defendant's protestations of recent (now several months ago) document production have not produced any specific, or for that matter, general allegation of costs claimed by MY which were caused by SWEC's performance or breach, unrelated to the government's breach of the SNF removal contract. Absent tendered evidence of specific costs raising any of these issues, no viable basis for further proceedings has been shown.

MY represents that it has produced all its responsive files except for those subject to privilege, addressed *infra,* which satisfies its discovery obligations. "Each Yankee has undertaken more than reasonable efforts to locate the documents that have been requested, and has produced everything it has been able to find, save only those documents listed on the privilege logs." (Pls.' Opp'n Mot. Compel 1, MY/ECF No. 91.) That representation is accepted. Defendant's insistence that there must be more documents does not create them. Defendant has not established a viable basis to support its Motion to Compel.

### Attorney-client privilege and attorney work product doctrine

MY withheld documents asserted to be privileged from production. Thereafter, through the cooperation of counsel, a dispute as to the adequacy of MY's privilege log of withheld documents was narrowed, and a document-specific itemization of 1,058 entries was provided by MY to defendant on November 10, 2011. From that list, defendant narrowed its focus to 167 documents highlighted in Exhibit B to its Motion to Compel. Defendant does not contend these documents are not privileged; rather, defendant asserts that the attorney-client privilege and attorney work product doctrine protections have been impliedly waived.

An implied waiver of a privilege can be found if:

(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Zenith Radio Corp. v. United States*, 764 F.2d 1577, 1579 (Fed. Cir. 1985).

Defendant reasons that by placing dry storage costs and the SWEC settlement proceeds and allocations at issue, MY impliedly waived the attorney-client privilege and the attorney work product doctrine and the 167 documents which consist of communications by and between counsel and between counsel and MY must be produced. (Def.'s Mot. Compel 19, MY/ECF No. 84.)

MY responds that there is no waiver simply because counsel discuss issues in a case either among themselves or with the client – a common occurrence. This is in contrast to a situation where, for example, good faith reliance on advice of counsel is raised as a defense. In that instance, the communication from counsel may not be shielded from discovery. In contrast, in the circumstances presented, MY concludes, "[t]here has been no waiver of privilege, implied or otherwise because neither Yankee has sought to support its claim by asserting that it relied on the advice of counsel, nor has either Yankee used the privilege to shield discovery of the actual underlying facts supporting its claims." (Pls.' Opp'n Mot. Compel 1, MY/ECF No. 91.)

The very cases upon which the Government relies draw a crucial distinction between the common situation where privileged documents concern an issue which is itself relevant to the case, and the less common situation where a party puts at issue the legal advice itself, such as by proving its good faith by pointing to reliance on the advice of counsel. In the former situation, there is no waiver, at least unless the privilege is used to shield all discovery of the underlying facts. In the latter situation, not present here, there can be a waiver where the other criteria are met for finding waiver.

(*Id.* at 7.)

*Zenith Radio Corp. v. United States*, 764 F.2d 1577 (Fed. Cir. 1985) cited by defendant as support, rather illustrates why defendant's sword/shield characterization is inapt here, MY asserts. In *Zenith Radio* the government sought to recover lost interest payments from Zenith due to payment delays. Zenith responded that third-party importers were responsible for the delay and the government should have gone after them. After learning of possible disagreement between lawyers in two different agencies as to whether claims for lost interest should have been pursued against the importers, Zenith sought to discover communicative documents between the lawyers, arguing as defendant does here, the attorney-client privilege and attorney work product doctrine were waived as to counsels' correspondence concerning whether the lost interest could or should have been recovered against another. The Federal Circuit, however, sustained the government's assertion of privilege, rejecting Zenith's argument that by claiming lost interest, the government waived whatever privilege it had regarding communications concerning whether that claim could or should have been pursued against another party. *Id.* at 1579. Citing the sanctity of the attorney-client privilege, the Federal Circuit observed that Zenith could have sought discovery from the government as to the underlying facts, deposing the individual decision-makers, rather than seeking to discover what the decision-makers were told by their lawyers on the subject. *Id.* at 1579-80.

In *Jade Trading, LLC v. United States*, also cited by defendant, the IRS relied on regulations in concluding the plaintiff was a sham entity. The plaintiff sought to discover documents relating to the promulgation of the regulation relied upon, which the IRS sought to protect on the basis of the executive privilege. The plaintiff argued that the government waived the privilege by relying on the regulation – putting the regulation at issue. 65 Fed. Cl. 487, 488 (2005), *aff'd in part, rev'd in part, vacated in part on other grounds*, 598 F.3d 1372 (Fed. Cir. 2010). The court upheld the government's privilege claim because the government did not "purport to rely on any underlying privileged opinions or communications relating to provisions of the Code or regulations to support its position" that the plaintiff was a sham entity, and did not "inject[] privileged material into this lawsuit and attempt[] to use it both as a sword and a shield." *Id*. at 488, 497.

In *Afro-Lecon, Inc. v. United States*, 820 F.2d 1198, 1203 (Fed. Cir. 1987), also cited by defendant, the plaintiff who was the subject of a criminal investigation, sued for increased costs due to government delay and in that civil suit refused to produce its costs data, invoking its Fifth Amendment privilege. Applicability of the

sword/shield defense was a given and the only issue was whether a stay of the civil proceedings pending the criminal investigation was appropriate.  That is not the situation here.

Finally, in *Energy Capital Corp. v. United States*, 45 Fed. Cl. 481 (2000), the government terminated plaintiff's contract to provide loans for renovations to Housing and Urban Development units to make them more fuel efficient.  Plaintiff sued for lost profits. The government challenged the claim for lost profits as speculative and sought production of correspondence to the plaintiff from its legal counsel relating to the riskiness of the program.  In response to claims of attorney-client privilege, the government argued the plaintiff waived the privilege by placing the documents "at issue."  The court upheld the privilege, explaining that "[t]he advice of counsel about the risks, possible successes, and best way to structure the [] program is one step removed from the actual risks." 45 Fed. Cl. at 488.  Although it is "always possible that the client's motive or conduct was influenced by something his attorney told him, [] compelling the production cannot be justified solely as a means to check the [plaintiff's] statements."  *Id*. (quoting *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F.R.D. 408, 417 (D. Del. 1992)).

In its Motion, defendant here hypothesizes that these 167 documents "should shed light on MY's increased ISFSI construction costs and MY's decision to withhold the SWEC settlement proceeds" and "directly relate to the underlying increased ISFSI construction costs and settlement proceeds at issue in this case, and appear to contradict the litigation position that MY adopted in the SWEC bankruptcy proceedings." (Mot. to Compel, MY/ECF No. 84 at 22.)  The amount and details of the contract, the work, the termination, the increased ISFSI construction costs, the SWEC settlement and MY's allocation of proceeds, could and were obtained from MY and other percipient witnesses and from prior litigation filings.  The amount of the contracts, the work that was performed, and MY costs were all fully vented and presented at trial.  Indeed, one of defendant's experts, advocating adjustment, testified in detail, with demonstratives, criticizing the allocation of settlement proceeds between ISFSI construction and decommissioning.

Thus, there is no allegation that the only source of underlying facts concerning the allocations of the MY settlements, causation, foreseeability or reasonable certainty of MY's ISFSI construction costs is in the 167 privileged documents.  As in *Jade Trading*, *Zenith*, and *Energy Capital*, there has been no showing that the

privileged communications are the only source, or a source, of primary underlying facts of either any increased ISFSI construction costs that could be attributed not to DOE but to either SWEC's deficient performance or MY's mitigation.  Even if any of the targeted communications include discussion of costs, settlement of SWEC litigation, or allocation of proceeds, at best the communications would be other than the primary factual sources explored, presented at trial or previously available to the defendant.

In its Reply defendant characterizes this unique hybrid situation as concerning not the substance of the legal advice being sought as in MY's cited precedent of a tendered defense of reliance on advice of counsel.  Rather, the privilege asserted involves counsel perhaps creating the allocation decisions at issue – factual evidence sought to be included in the trial record.  Defendant adds that if flagged correspondence is of counsel discussing the resolution of litigation with the mitigation contractor which, under the circumstances presented, may set the amount of credit or offset to defendant's liability, then authority cited by MY is likewise distinguishable and those relevant facts should not be shielded from discovery.

The Government should be permitted to review documents probative of the ISFSI construction costs and settlement proceeds in order to identify or discover the exact nature and amounts of the harm caused by Bechtel and SWEC.  The Government has requested only those documents that should shed light on plaintiffs' increased ISFSI construction costs and plaintiffs' decision not [to] reduce their claims against the Government by the amounts received from settling their litigation with Bechtel and SWEC.  The requested documents are vital to the Government's arguments because those documents directly relate to the underlying increased ISFSI construction costs and settlement proceeds at issue in these cases, and they appear to contradict the litigation positions that CY and MY adopted in their respective lawsuits against Bechtel and SWEC.  To permit CY and MY to use the attorney-client privilege and attorney work product doctrine to shield these requested documents from production would be manifestly unfair to the Government.

(Def.'s Reply 13, MY/ECF No. 93 (footnote omitted).)

This position differs somewhat from the initial Memorandum. The inference that counsel may have been primarily instrumental in these operative facts does not neatly fit into the above-cited authority. The court previously suggested counsel employ Federal Rule of Evidence 502(d), or if necessary, the court inspect the documents *in camera*. Whether or not defendant has made a sufficient showing of need to justify discovery of the privileged documents, the court remains willing to inspect these documents *in camera* and apply the general parameters of waiver discussed herein. In this regard, however, that while the entire trial record has not been reviewed, in a separate section of its Pretrial Memorandum defendant affirmatively stated that "[MY] Has Failed Properly To Credit The Settlement Proceeds To Its Claim Against the Government."

> Of the remaining $17 million that [MY] has recovered during the current claim period, [MY] only allocated $5.4 million to the ISFSI project – thus reducing its damages claim by that amount. However, as we will establish at trial, [MY] has not allocated the correct amount for two reasons: (1) the calculation that resulted in the $5.4 million amount is flawed, and (2) the calculation does not properly reflect [MY's] attribution of the damages to the ISFSI project when it sought damages in the bankruptcy proceeding. As we will establish, in part through testimony of our expert, R. Larry Johnson, approximately $13.4 million of the SWEC settlement proceeds received in this claim period should be allocated to ISFSI construction costs, necessitating a reduction of an additional $8 million to prevent double recovery of ISFSI-related costs by [MY].

(Def.'s Initial Pretrial Brief. 23-24, MY/ECF No. 63.)

Defendant also pointed out at trial that in the SWEC bankruptcy proceedings MY sought a total of $81 million in damages and attributed approximately $15.6 million to the ISFSI portion of the project. (*Id.* at 23-24.) In a footnote defendant cited outstanding discovery requests as to how this $15.6 million was calculated. Nevertheless, at trial there was considerable testimony and evidence as to the allocation and the court recalls specifically a series of demonstratives by defendant's expert R. Larry Johnson contesting this allocation. Mr. Johnson used two methods to recalculate the amount of the SWEC settlement proceeds that should be allocated to ISFSI construction – using the contract ratio and using MY's own estimate. Of

particular note is Johnson Demonstrative 19, taken from MY's internal documents, PX 43, which from a total damages claim of $81 million, concludes the total claim amount attributable to the ISFSI is $15,558,403, and the total claim amount attributable to the non-ISFSI is $65,441,597. Mr. Johnson also criticized MY's "cap" used to allocate settlement proceeds.

While the court is not addressing the merits of these positions, or whether the record contains additional evidence or argument in this regard, the point is substantial evidence including expert testimony is in the record as to the allocation, citing primary evidence from MY and other sources, making defendant's protestations weak. Any discussion between MY counsel as to allocations, if consistent with internal MY and other primary evidence already in the record, would be "once-removed" and cumulative at best. If inconsistent with what MY actually did, it would be irrelevant. Nevertheless, if upon further consultation between counsel, defendant in good faith contends that some or all of the 167 documents may have primary factual relevance as a decision by or on behalf of MY to allocate proceeds or to settle (primary factual relevance meaning decisional facts by or on behalf of MY as opposed to argument, opinion or cumulative facts available elsewhere from other than counsel), and wishes specific documents be submitted by MY or its counsel directly to chambers under seal for *in camera* review (it being understood that counsel for either party may have concerns regarding *in camera* review), an appropriate request for such review shall be filed on or before the date scheduled hereinafter.

## Contentions concerning CY

CY retained Bechtel to build and load CY's ISFSI, which it would not have done had DOE not breached the contract to remove SNF, and which was a foreseeable and reasonable consequence thereof, conclusions that are not disputed. The Bechtel contract also included decommissioning services incident to shutting down CY's nuclear power plant, costs and efforts that CY would have incurred regardless of whether DOE breached. Thus decommissioning costs were not caused by DOE's breach. CY terminated Bechtel. Neither CY's retention or termination of Bechtel is challenged by defendant. FERC proceedings upheld the prudency of both decisions as well as the accounting treatment – allocation of the costs to complete the work originally required by the Bechtel contract.

The Bechtel contract was for a total fixed price of $240 million, roughly $187 million for decommissioning and $53 million for ISFSI construction and cask loading. Its contract with CY limited Bechtel's liability to 25% of the contract price, or $60 million. In June 2003 (during the Phase II claims period), CY terminated Bechtel and completed the work at a cost for decommissioning activities alone of more than $60 million more than the fixed contract price. Bechtel sued CY in Connecticut state court. CY filed counterclaims. Litigation between CY and Bechtel was extensive and, according to CY, litigation costs exceeded settlement proceeds;[8] accordingly, there are no collateral source funds to credit to the amount of costs for which CY asserts defendant is liable.

On July 1, 2004, CY filed an updated schedule of costs with FERC, based on estimates to complete decommissioning and dry storage after the termination of Bechtel. Thirteen parties intervened in the ensuing proceedings which included allegations that CY imprudently managed Bechtel's performance before termination. After three weeks of contested hearings, in June 2005, the ALJ decided that CY acted prudently in terminating Bechtel and in self-performing the work. *See Connecticut Yankee Atomic Power Co*., Initial Decision on Decommissioning Costs, 113 FERC ¶ 63,026 (Nov. 22, 2005). The ALJ also ordered CY to place any net proceeds it received from Bechtel into its decommissioning trust. 113 FERC ¶ 63,026, at ¶ 262. CY complied.

As with MY, CY's costs related to its self-performance of ISFSI construction work following Bechtel's termination were subjected to FERC review and approval. FERC Docket Nos. ER04-981 and ER08-1351, including specifically *Connecticut Yankee Atomic Power Co*., Order Approving Settlement, 117 FERC ¶ 61,192 (Nov. 16, 2006). *See System Fuels, Inc. v. United States*, 666 F.3d 1306, *4 (Fed. Cir. 2012) (citing as significant FERC-mandated accounting procedures).

In this Phase II litigation defendant contends that any increased costs of CY over and above the Bechtel contract price were not caused by DOE's breach and that CY should have recovered more from Bechtel.

[CY] cannot recover any increased costs that resulted from the need to terminate Bechtel for two reasons: (1) [CY] cannot establish that

---

[8] Defendant complains that the Bechtel settlement amount was improvident.

the resulting costs increases were caused by DOE's delay or foreseeable to DOE at the time of contract formation; and (2) [CY], in accepting a settlement with Bechtel, has failed to take reasonable steps to mitigate its losses.

(Def.'s Initial Pretrial Brief 16 (footnote omitted), CY/ECF No. 69.)

With this background as a preface to the Motion to Compel, defendant complained prior to the trial that deficient document production hindered its trial presentation:

The Government cannot calculate the increased costs attributable to the termination of Bechtel because [CY] has refused to produce the documents that are relevant to this determination, despite repeated requests from the Government. Pursuant to the Court's September 2, 2011, order, we continue to seek to resolve this issue and ask that the Court keep the record open for further evidentiary proceedings once the Government has obtained the documents and taken the necessary additional discovery. The scheduling of that further proceeding is controlled, in part, by [CY] and when [CY] decides to produce the requested material.

(*Id.* at 16 n.3.)

Defendant filed a Motion to Compel prior to trial asserting that:

[E]ach of the Yankees experienced significant problems and delays in the construction of their ISFSIs as a result of their contractors' deficient performance and termination. The Government, since the beginning of discovery in these cases, has repeatedly requested documents related to these issues in order to determine whether there are any increased costs included in the Yankees' damages claims that were the result of these problems, rather than the direct and foreseeable result of the delay by the Department of Energy ("DOE") in performing the Standard Contract.

(Def.'s Mot. Compel 2, CY/ECF No. 70.)

Subsequently, and sporadically defendant claims, CY belatedly provided additional documents, including 106 deposition transcripts taken in the CY/Bechtel Connecticut State Court litigation but without exhibits.  CY also produced a copy of one of Mr. Helin's reports, copies of Mr. Lemley's work papers, and a copy of the counterclaim damages invoice that CY submitted to Bechtel on October 5, 2005.  "On December 9, 2011, CY produced another 292 pages of documentation, including Mr. Helin's deposition transcript – without the accompanying exhibits – and copies of additional work papers that Mr. Lemley prepared." (Def.'s Mot. Compel 12, CY/ECF No. 99.)  On December 14, 2011, CY provided defendant with a forty-six page privilege log of 555 documents withheld from production based upon attorney-client privilege and/or attorney work product grounds. (*Id.* at 7 n.2.)  Defendant states that it reserved the right to file another motion to compel as to these withheld documents. (*Id.* at 8.)

More recently, defendant's Response to the Court's October 13, 2011 Order reported that:

> [W]e understand that CY is in the process of reviewing another 90 boxes of documents that are potentially responsive to the production requests at issue in our motion to compel.  Furthermore, despite several representations by plaintiffs' counsel, both at the pretrial conference and during trial, that CY had produced all deposition transcripts in its possession relating to its litigation with [Bechtel], CY located – after the trial and at its own offices – an additional 71 deposition transcripts.  On October 27, 2011, CY produced the 71 transcripts to us, and we presently are in the process of reviewing them.  Of particular significance, in the cases of the recently produced MY documents the 90 boxes of CY documents, and the 71 deposition transcripts, the documents are potentially responsive to the very same requests for production of documents we served on CY and MY on March 1, 2011 – more than eight months ago and well before the October trial.

(Def.'s Reply 2, CY/ECF No. 94.)

Notwithstanding the foregoing, defendant complains that CY's production has been deficient.  Defendant's renewed Motion to Compel seeks three categories of additional documents from CY:

- 19 -

- All internal [CY] memoranda, correspondence, reports, white papers, and presentations relating to the assessment or determination of increased costs or other impacts to [CY] resulting from Bechtel's deficient performance.
- All expert reports and associated work papers prepared by or on behalf of [CY] (including reports prepared by Frank Helin, Jack Lemley, and Charles Miller) relating to the legal proceedings between [CY] and Bechtel in Connecticut Superior Court, Docket No. X-03-CV-03-0523088-S, as referenced in CY0026991-7011.
- All fact and expert witness deposition transcripts from the legal proceedings between [CY] and Bechtel in Connecticut Superior Court, Docket No. X-03-CV-03-0523088-S, as referenced in CY0026991-7011.

(Def.'s Mot. Compel 5, CY/ECF No. 99.)

Specifically, defendant complains that other than a single report from Mr. Helin and Mr. Lemley's work papers, CY has not provided any other expert report or work papers relating to the Bechtel litigation which, according to defendant should at minimum include reports from Charles Miller. From these remaining documents alleged to exist in CY's records, defendant contends it would be "better able to establish whether these increased costs to construct CY's ISFSI are attributable to or are the result of Bechtel's deficient performance rather than DOE's delay." (*Id.* at 13.) Secondly, defendant suggests such documents

should show the extent to which the settlement proceeds were related to the resolution of the contractual dispute over Bechtel's construction of CY's ISFSI or, instead, over the decommissioning of CY's facility. Without this information, it is impossible to determine the extent to which CY has already been compensated for the losses it claims in this lawsuit.

(*Id.* at 13-14.)

It is reasonable, defendant surmises, that CY has in its possession at least the following documents encompassed in prior document requests:

- All the responsive documents referenced in DX6176 including all documents relating to Carla M. Pizzella's workpapers.
- The 2003 estimate that is used as the basis for the calculations set forth in DX6180.
- The analysis that is used as the basis for the 15-month delay and $17.7 million cost increase conclusion in DX6185.
- All the Shaw Reports referenced in DX6207.
- The affidavit of Todd Smith referenced in DX6169.
- All the documents identified in the privilege log produced in CY's opposition to Merrill Atkin's motion to compel (see FERC Accession Number 20050118-0201).
- All of the documents referenced in the privilege log attached to CY's letter, dated January 11, 2005, to FERC.
- The analysis that was created in ISFSI cost estimate change of $32.9 million and the analysis created in the previous estimate that was $10.5 million less included in the chart of project completion costs (see FERC Accession Number 20050504-0579).
- Spreadsheets identified in cost analysis referenced in Cost Analysis For An Early Bechtel Contract Termination (see FERC Accession Number 20050504-0579).
- Spreadsheet and supporting documentation for costs depicted in Data Request CT-315 Response (see FERC Accession Number 20090627-0100).
- Analysis that provides the basis for $66 million estimate in Risk Analysis presentation dated July 22, 2002 (*see* FERC Accession Number 20090627-0242).

- 21 -

- Spreadsheet and all other related spreadsheets and sources related to cost to complete change attributions attached to November 11, 2004 e-mail from Thomas Bennett (*see* FERC Accession Number 20090627-0285).
- All deposition exhibits to Todd Smith's February 9, 2006 deposition.
- All deposition exhibits to Carla Pizzella's June 1, 2005 deposition.
- All deposition exhibits to Jack Lemley's January 20, 2006 deposition.

(*Id.* at 14-15 (footnote omitted).)

It is noted that defendant called Mr. Frank Helin as a witness at trial (Trial Tr. 427-53) and his deposition was taken in this Phase II case as he was questioned about his deposition testimony. (*Id.* at. 447-50.) As an independent contractor Mr. Helin served as spent fuel transfer manager at CY. He was questioned about that project, which he described as essentially assuming responsibility for what had been Bechtel's work that CY was then self-performing. Mr. Helin had been retained as an expert witness for CY in the Bechtel litigation and in that capacity he was deposed. In the Phase II trial, defendant on direct examination asked Mr. Helin whether his opinion in the Bechtel litigation attributed any delay in the dry storage project to Bechtel. Mr. Helin responded that he did not recall any specific delays, but generally, "[g]iven the time that Bechtel had been there and the progress they had made, it was certainly much longer than I would have expected to have taken, yes." (*Id.* at 445.) Mr. Helin also testified to chipping and spalling on CY's concrete ISFSI pad, consequences of Bechtel's overworking of the concrete at a low temperature. (*Id.* at 445-46.)

CY points out that defendant has conceded that it was reasonable to hire Bechtel and reasonable to terminate Bechtel, and that the construction of an ISFSI was a reasonably foreseeable mitigation response caused by DOE's breach. The expenses sought by CY in these proceedings were all determined to be prudent and approved by FERC. And, as noted, as part of the audit process, CY produced the underlying project invoices for review by defendant's auditors, showing what was done as well as what and when payments were made. And, CY states, the Bechtel dispute was largely aired in Connecticut State Court and in FERC proceedings in

- 22 -

which FERC staff argued CY acted imprudently in not terminating Bechtel sooner, filings all available on FERC's public website.  CY reminded defendant of this availability.

Nevertheless, CY relays that it took the following steps:

- After trial, counsel for [CY] sent a formal letter to its former counsel in the Connecticut Action to confirm [CY's] understandings as to the existence of expert reports, the so-called Helin "position paper" and the existence of deposition transcripts.  On October 27, 2011, [CY] provided the Government with the responses it received confirming that no expert reports were prepared, that [CY's] former counsel were unaware of the existence of any position paper prepared by Mr. Helin, and that former counsel were not aware of any other deposition transcripts still existing beyond those already provided to the Government.
- [CY] then took the further step (at considerable expense) of going file by file and document by document through any miscellaneous personal working files left behind by employees who worked on the project involving Bechtel.
- In doing so, [CY] located an additional 85 deposition transcripts in the working files. [CY] provided them to the Government on a rolling basis as it became aware of them: it provided 69 to the Government on October 27, 2011; nine to the Government on November 17, 2011; six to the Government on December 5, 2011; and one final transcript to the Government on December 9, 2011. Among the transcripts are transcripts of the depositions of Messrs. Helin, Lemley, and Miller.
- [CY] also located what may perhaps be Mr. Helin's "position paper," and provided it to the Government on October 27, 2011.

- 23 -

- On December 5, 2011, in addition to the deposition transcripts it provided, [CY] provided the Government with about 1400 pages of documents it was able to find amidst the personal files which fit within the three categories of documents the Government seeks. Among the documents are work papers of Mr. Lemley.
- On December 9, 2011, [CY] completed its review of the personal working files and produced to the Government approximately 250 pages of documents (in addition to the final deposition transcript). Among these, are documents which appeared to be additional work papers of Mr. Lemley. [CY] also informed the Government that it had completed its review and production and was not aware of any additional documents that fit within those categories sought by the Government.
- Finally, on December 14, 2011, [CY] provided the Government with its privilege log applicable to the files it had reviewed.

(Pls.' Opp'n Mot. Compel 5-6, CY/ECF No. 106 (citations omitted).)

Similar to MY, CY represents that on December 9, 2011 (before defendant filed its latest Motion to Compel) it informed defendant that "it [was] not aware of any further non-privileged internal memoranda, correspondence, reports, white papers, [or] presentations relating to the assessment or determination of increased costs or other impacts to it as a result of Bechtel's deficient performance," (*id.* at 6) accordingly there is nothing more to produce. Defendant's chastising that there must be more because CY after initial production "found" the documents described immediately above, which were provided to defendant in November and December, is not dispositive.

Defendant cites the history of CY uncovering more and more documents as evidence that there must be more documents. Responding almost that "no good deed goes unpunished," defendant implies nefarious motivations and CY characterizes its production as diligent and consistent with obligations to update. No sanctions are

sought, nor appear to the court to be appropriate in the circumstances presented. CY responds that, unlike MY, it did not retain litigation files from the Bechtel dispute; therefore, in response to defendant's document requests, CY contacted its former outside counsel who handled the dispute, and obtained from them the pleadings and any retained deposition transcripts, all of which were provided to defendant prior to trial. CY also confirmed with its former outside counsel that expert reports were not prepared in CY's dispute with Bechtel, and that counsel was not aware of a "position paper" by Frank Helin. Self-described as extraordinary effort, CY reviewed employee files for responsive documents. Defendant retorts that rather than extraordinary, CY's quest was obligatory and should have been done in response to the initial document requests as part of its discovery obligation. Dispersions aside, and there being no request for sanctions, CY represents that, except for privileged documents withheld, it has provided all it can locate and it can't produce what it doesn't have.

Evidence, argument, findings and conclusions from collateral litigation has been open and available to defendant. The substance of the claims and counterclaims between CY and Bechtel in state court presumably concerned the nature and quality of Bechtel's work, which is what defendant now contends here it needs to identify and if included in costs CY now seeks, argue were not caused by defendant's breach or were not foreseeable.[9]

It is concluded that whether mitigation costs were incurred was fully tried as were many issues identified by defendant's expert as to whether certain discrete costs would have been incurred in the non-breach world. Only duly-established foreseeable, incremental costs caused by DOE's breach would be recoverable. Remaining issues as to whether otherwise established costs should be reduced by additional credits from settlement would be resolved by application of independent argument and evidence, not reconsideration of ground already traveled. Likewise, whether any otherwise established incremental costs should be subtracted because they were caused by independent, superceding acts, omissions or breaches of SWEC, Bechtel, or plaintiffs (and no specifics have been suggested), would not require

---

[9] Defendant represents that CY finally produced a copy of the counterclaim damages invoice that CY submitted to Bechtel on October 5, 2005. Defendant had been seeking that document since March 1, 2011. As noted, however, Bechtel's affirmative claims against CY and CY's counterclaims in Connecticut State Court were matters of public record, and defendant apparently did not contact Bechtel.

significant duplication of effort.  Accordingly, post-trial briefing shall proceed on the existing record.

ACCORDINGLY, it is **ORDERED**:

1. Defendant's Motion to Compel (CY/ECF No. 99) is **DENIED**.  Defendant's Motion to Compel ( MY/ECF No. 84) is **DENIED** in part and **GRANTED** in part as provided herein.  On or before **March 16, 2012**, counsel shall file a Joint Status Report of any documents identified for *in camera* review.  Within ten days thereafter, any documents so identified shall be **submitted under seal** directly to chambers by MY, including the Entry Numbers as indicated on Exhibit B to the Motion to Compel.

2. The December 20, 2011 filing date established in the November 18, 2011 Order (CY/ECF No. 96, MY/ECF No. 81) and defendant's December 16, 2011 Motion for Enlargement of Time to File a Motion in Support of its Request for Additional Evidentiary Proceedings (CY/ECF No. 100, MY/ECF No. 85) remain **SUSPENDED.**

3. The following briefing schedule is established:

   (a)    The parties shall file initial post-trial briefs on
          or before **April 6, 2012**; and

   (b)    Responses to the initial post-trial briefs shall
          be filed within thirty days thereafter.

Any request for oral argument shall be included in the briefs and would be scheduled following consultation with counsel as to their availability.

s/ James F. Merow

James F. Merow
Senior Judge