# In the United States Court of Federal Claims

Filed November 14, 2013[1]
Case Nos. 07-876 C, 07-875 C, 07-877 C

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, )<br>Plaintiff, )<br>v. )<br>)<br>THE UNITED STATES, )<br>Defendant. ) | Partial Breach of Standard Contract for Disposal of Spent Nuclear Fuel; Damages; Foreseeability; Causation; Allocation of Settlement Proceeds; Recovery of Lobbying Costs; and Recovery of Litigation Costs. |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, )<br>Plaintiff, )<br>v. )<br>)<br>THE UNITED STATES, )<br>Defendant. ) | |
| MAINE YANKEE ATOMIC POWER COMPANY, )<br>Plaintiff, )<br>v. )<br>)<br>THE UNITED STATES, )<br>Defendant. ) | |

*William J. Kayatta, Jr.*, Pierce Atwood LLP, Portland, Maine, for plaintiffs. *Eric J. Wycoff* and *Lucus A. Ritchie*, Pierce Atwood LLP, Portland, Maine, and *Timothy Heffernan*, Watt, Tieder, Hoffar & Fitzgerald LLP, McLean, Virginia, of counsel.

*Anthony W. Moses*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom appeared *Stuart F.*

---

[1] This opinion was issued under seal on November 1, 2013, pending review for possible corrections and redactions. No corrections or redactions were proposed and this Opinion is now released in its entirety for publication.

*Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Harold D. Lester, Jr.*, Assistant Director, for defendant.  *Andrew Averbach*, Senior Trial Counsel, *James P. Connor*, *Seth W. Greene*, *Joseph D. Keller*, *Daniel G. Kim*, and *Scott Slater*, Trial Attorneys.  *Jane K. Taylor*, Office of General Counsel, United States Department of Energy, Washington, D.C., of counsel.

## OPINION

**Merow**, *Senior Judge*

The plaintiffs in this matter, Connecticut Yankee Atomic Power Company ("Connecticut Yankee"), Yankee Atomic Electric Company ("Yankee Atomic"), and Maine Yankee Atomic Power Company ("Maine Yankee") (jointly the "Yankees" or the "utilities"), initially filed suits against the United States in 1998, alleging that the United States Department of Energy ("DOE") breached certain contractual obligations to each of the plaintiffs relating to the removal of spent nuclear fuel ("SNF").  *See Yankee Atomic Elec. Co. v. United States*, No. 98-126 (Fed. Cl. filed Feb. 18, 1998), *Connecticut Yankee Atomic Power Co.*, No. 98-154 (Fed. Cl. filed Mar. 4, 1998), and *Maine Yankee Atomic Power Co.*, No. 98-474 (Fed. Cl. filed Jun. 2, 1998) (together the "1998 cases").  Following the initial trial, the defendant was found liable to all three plaintiffs, in varying amounts.  *See Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006).

This court's decision was affirmed in part and reversed in part by the Federal Circuit, which held, *inter alia*, that, based on the Circuit's recent decision in *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005), this court did not have authority to award future damages.  *See Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268 (Fed. Cir. 2008).  The case was then remanded for a separate trial on damages.  *See Yankee Atomic Elec. Co. v. United States*, 94 Fed. Cl. 678 (2010) (damages award *aff'd* in part, *rev'd* in part by *Yankee Atomic Elec. Co. v. United States*, 679 F.3d 1354 (Fed. Cir. 2012)).

In accordance with the Federal Circuit's ruling in *Indiana Michigan*, the plaintiffs filed separate actions to recover damages incurred following the 1998 cases.  *See Connecticut Yankee Atomic Power Co.*, No. 07-875 (Fed. Cl. filed Dec. 14, 2007), *Yankee Atomic Elec. Co. v. United States*, No. 07-876 (Fed. Cl. filed Dec. 14, 2007), and *Maine Yankee Atomic Power Co.*, No. 07-877 (Fed. Cl. filed

Dec. 14, 2007) (together the "2007 cases").  A trial to determine damages in the 2007 cases was held in October 2011.

Because no additional issues of liability are raised in the 2007 cases, the court will not rehash matters decided in the 1998 cases.  As such, the questions currently before the court are limited to the calculation and allocation of damages incurred from the DOE's continuing breach.  *See* Doc. No. 58 at 4[2]  (Joint Status Report stating that the only remaining issue "is the amount of damages owed to the [plaintiffs], and in identifying that amount, the Government will not invoke the 'Unavoidable Delays' clause" in the contracts at issue).

## FINDINGS OF FACT

Prior to trial, the parties cooperated in an extensive audit process and substantially narrowed the issues before the court.  *See* Tr. at 91:3-23 (Smith).  In broad strokes, there are five issues left for the court to resolve:  (1) whether increased construction costs may be recovered, whether the utilities properly mitigated those increased costs, and whether related settlement proceeds have been properly allocated to offset those costs; (2) whether plaintiffs have calculated the proper time frame for reimbursement of wet pool storage costs; (3) whether certain specific expenses related to the transfer and dry storage of SNF are recoverable; (4) whether lobbying costs are recoverable; and (5) whether the Town of Haddam litigation costs are recoverable.  The following facts are relevant to deciding these issues.

## I.   CONNECTICUT YANKEE

On June 30, 1983, the government entered into a contract with Connecticut Yankee, under which the government, through DOE, undertook the responsibility to dispose of nuclear waste.  PX001 at HQ0016888.[3]  In this second phase of

---

[2]  Despite the fact that the three cases are docketed separately, many of the filed documents are identical between them.  For simplicity, citations to document numbers throughout this opinion will be to the Connecticut Yankee docket, No. 07-875, unless otherwise noted.

[3]  In *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006), the court wrote extensively on the contracts between the utilities and the government and on the historical context in which the contracts came about.  In the interest of focusing on the new issues before the court, the discussion is not repeated in this Opinion.

litigation, Connecticut Yankee seeks damages suffered between January 1, 2002, and December 31, 2008, as a result of the partial breach of that contract. *See* PX004 at 1.

Connecticut Yankee's claimed damages total $135,075,630. *See* PX004 at 3; Doc. 111 at 14 (noting changes in the claimed amount as a result of Connecticut Yankee withdrawing its claims related to the work platform, water box, and waste packaging and disposal). The categories are divided as follows:

| | |
|---|---|
| ISFSI Operational Costs: | $18,876,128 |
| ISFSI Construction Costs: | $83,131,427 |
| Wet Pool Operational Costs: | $35,159,923 |
| Less Agreed Upon Adjustments: | ($2,091,848) |
| | _____ |
| Total: | $135,075,630 |

*See* Doc. 111 at 14; PX4D; PX4E; PX4F; and PX4A.

Each of the plaintiff utilities were decommissioned prior to trial. *See* Tr. at 130:9-11 (Smith). In other words, all buildings, except the dry storage facilities, known as independent spent fuel storage installations ("ISFSIs"), were demolished, the Nuclear Regulatory Agency acknowledged that the site was properly cleaned up, and the operating licenses only included the ISFSIs. *See* Tr. at 130:15-24 (Smith). The Connecticut Yankee plant was decommissioned in 2007. *See* Tr. at 131:3-5 (Smith).

In the 1998 cases, this court held that, in the non-breach world, considering exchanges that would have occurred in scheduling disposal of Connecticut Yankee's spent nuclear fuel, DOE would have removed the last of the fuel by the end of 2002. *See Yankee Atomic*, 94 Fed. Cl. at 693. In the actual world, Connecticut Yankee removed the last of its fuel from its wet pools on March 30, 2005. See Tr. at 117:4 (Smith).

Connecticut Yankee contracted with Bechtel Power Corporation ("Bechtel") for the construction of its dry storage facility and to perform decommissioning activities at the plant. The fixed price of the contract was $240 million, about $53

4

million of which was attributed to dry storage construction costs. *See* PX53 at CY0000311 (items 17 and 18); Doc. 111 at 27.

Connecticut Yankee terminated the Bechtel contract because the contractor was not performing, and assumed construction and decommissioning work on its own. *Yankee Atomic*, 73 Fed. Cl. at 292. Connecticut Yankee ultimately spent approximately $108 million to complete the dry storage project. *See* Tr. at 243:16-244:10 (Norton) (explaining that some of the $108 million covered costs that were not within the Bechtel scope of work, but stating that there were cost overruns); *see also* Tr. at 253:18-255:11 (Norton) (explaining that even though there were cost overruns relative to the original fixed contract price, the price paid in the end was not unreasonable).

Bechtel sued Connecticut Yankee, alleging improper termination, and Connecticut Yankee countersued. Tr. at 187:18-189:18 (Norton). On advice of a professional mediator, the parties ultimately settled the dispute under an agreement that required Bechtel to pay Connecticut Yankee a sum of $15 million. *See* PX57 at CY0145691; Tr. at 192:8-12 (Norton). In a related rate case before the Federal Energy Regulatory Commission ("FERC"), in which Bechtel intervened, the presiding administrative law judge found that the termination of the Bechtel contract, and the settlement agreed upon between the parties were appropriate and prudent decisions on Connecticut Yankee's part. *See* Tr. at 195:11-17 (Norton).

During the litigation, Connecticut Yankee incurred legal fees in an amount of $15.3 million. *See* Tr. at 138:17 (Smith). The utility placed its entire $15 million recovery into its decommissioning trust, a fund from which Connecticut Yankee pays for decommissioning and fuel storage expenses. *See* Tr. at 136:12-139:19 (Smith); PX57 at CY0145691; Tr. at 169:23-170:22 (Smith). When it deposited the funds into the trust, the utility did not categorize any part of the funds as specifically related to either decommissioning or dry storage. *See* Tr. at 175:16-176:6 (Smith). It did not believe there was any need to separate the funds because the settlement amount was less than the cost of attorneys' fees incurred during the dispute. *See* Tr. at 175:23-176:6 (Smith).

Once the ISFSI construction was complete, Connecticut Yankee undertook a campaign to transfer the spent fuel from wet pool storage into dry storage. In order to facilitate the transfer, Connecticut Yankee performed a number of tasks and

plant upgrades, the costs for which the government claims are unrecoverable.

First, the utility upgraded the crane it would use to move the fuel to enable it to safely handle heavier loads. Tr. at 125:9-12 (Smith). The crane also required repairs during the campaign. Connecticut Yankee has claimed $1,020,520 in upgrade and repair costs. *See* Doc. 58 at 10.

In order to set a proper loading sequence for the individual fuel containers, the utility had to characterize the fuel, or ascertain its technical physical characteristics. *See* Tr. at 118:20-119:9 (Smith). Connecticut Yankee incurred costs for fuel characterization during the relevant period in an amount of $249,934. *See* Tr. at 122:12 (Smith); Doc. 58 at 9.

Prior to moving the fuel, Connecticut Yankee needed to ensure that the fuel containers were adequately visible in the wet pools. To do this, the utility installed lighting and cameras, and cleaned the wet pool water. *See* Tr. at 124:15-124:23 (Smith); Tr. at 125:25-126:13 (Smith). Connecticut Yankee incurred costs for lighting and cameras in this damages phase in an amount of $81,659 and costs for pool cleaning in an amount of $494,361. *See* Doc. 58 at 9-10.

Finally, in order to safely transfer damaged fuel, it must either be housed in special fuel cans or reconstituted. *See* Tr. at 126:22-127:15 (Smith). Connecticut Yankee incurred costs associated with damaged fuel during the relevant period in an amount of $420,241. *See* Tr. at 127:19 (Smith); *see* Doc. 58 at 9.

Prior to constructing its ISFSI, Connecticut Yankee was required to obtain a building permit from the Town of Haddam, but the town resisted granting the permit, citing local zoning regulations. *See* Tr. at 260:22-261:4 (Pizzella). The parties began litigation, but eventually resolved the dispute by agreement, and the town issued the permit as Connecticut Yankee originally requested. *See* Tr. at 261:7-22 (Pizzella). Connecticut Yankee spent $685,895 in legal costs in order to obtain the permit. *See* Doc. 58 at 11.

## II.   YANKEE ATOMIC

On June 22, 1983, the government entered into a contract with Yankee Atomic, under which the government, through DOE, undertook the responsibility

to dispose of nuclear waste.   PX002 at HQ0007937.   In this second phase of litigation, Yankee Atomic seeks damages suffered between January 1, 2002, and December 31, 2008, as a result of the partial breach of that contract.  *See* PX005 at 1.

Yankee Atomic's claimed damages total $76,578,844.  *See* PX005 at 3; Doc. 111 at 14 (noting a reduction in Yankee Atomic's share of claimed lobbying costs). The categories are divided as follows:

| | |
|---|---|
| ISFSI Operational Costs: | $36,477,899 |
| ISFSI Construction Costs: | $35,144,094 |
| Wet Pool Operational Costs: | $13,597,926 |
| Less Agreed Upon Adjustments: | ($8,641,075) |
| Total: | $76,578,844 |

*See* Doc. 111 at 14; PX5; PX5A; PX5B; and PX5C.

The Yankee Atomic plant ceased operations in 1992, *see Yankee Atomic*, 73 Fed. Cl. at 293, and was decommissioned in 2007, *see* Tr. at 131:3-5 (Smith).   In the 1998 cases, this court held that, in the non-breach world, considering exchanges that would have occurred in scheduling disposal of Yankee Atomic's fuel, DOE would have removed the last of the fuel by the end of 1999.  *See Yankee Atomic*, 94 Fed. Cl. at 693.  In the actual world, the last of Yankee Atomic's fuel was removed from wet storage at some point in 2003, though no specific date was provided at trial.  *See* PX005F (spreadsheet showing wet pool operational costs ending in 2003).

Yankee Atomic contracted with NAC International, Inc. ("NAC") to perform fuel transfer work.  *See* Tr. at 428:7-10 (Helin).  Mr. Francis J. Helin acted as the site manager for the NAC project from 2000 to 2003.  *See* Tr. at 428:1-6. Mr. Helin testified that prior to his arrival, the project had been delayed.  *See* Tr. at 431:19-21.  Mr. Helin estimated that approximately three months were lost as a result. *See* Tr. at 433:6-18.

7

During the instant claims period, Yankee Atomic has made a claim to recover costs related to fuel characterization in an amount of $2,901,797, and costs related to damaged or reconstituted fuel in an amount of $369,518.  *See* Doc. 58 at 9.

## III.   MAINE YANKEE

On June 6, 1983, the government entered into a contract with Maine Yankee, under which the government, through DOE, undertook the responsibility to dispose of nuclear waste.  PX003 at TLG005206.  In this second phase of litigation, Yankee Atomic seeks damages suffered between January 1, 2003, and December 31, 2008, as a result of the partial breach of that contract.  *See* PX006 at 1.

Maine Yankee's claimed damages total $35,049,366.  *See* PX006 at 3; Doc. 111 at 14. The categories are divided as follows:

| | |
|---|---|
| ISFSI Operational Costs: | $29,201,413 |
| ISFSI Construction Costs: | $8,269,417 |
| Avoided Wet Pool Costs: | ($1,646,180) |
| Less Agreed Upon Adjustments: | ($775,284) |
| Total: | $35,049,366 |

*See* Doc. 111 at 15; PX6; PX6A; PX6B; and PX6C.

As with both Connecticut Yankee and Yankee Atomic, Maine Yankee was decommissioned prior to trial.  *See* Tr. at 130:9-11 (Smith).  This court ruled in the first phase of litigation, that DOE would have removed the last of Maine Yankee's fuel by the end of 2004.  *See Yankee Atomic*, 94 Fed. Cl. at 693.  Maine Yankee actually emptied its wet pools on February 27, 2004.  *See* Tr. at 109:6 (Smith).

Because DOE did not perform, Maine Yankee contracted with Stone and Webster Engineering Corporation ("SWEC") to build dry storage facilities and perform decommissioning activities.   The fixed price of the contract was $252.6 million, with approximately $57.3 million related to dry storage construction, and the balance related to decommissioning. *See In re Stone & Webster, Inc.*, 279 B.R.

748, 757 (Bankr. D. Del. 2002); PX75 at 4 and Schedule 2.  SWEC failed to perform under the contract and went bankrupt, and as a result, Maine Yankee terminated the contract.  *See* Tr. at 237:15-24 (Norton).  Maine Yankee then self-performed decommissioning and dry storage construction.  *See* Tr. at 182:19-183:7 (Norton).  In doing so, it incurred cost overruns on decommissioning in an amount of $129.5 million.  *See* Tr. at 148:11-18 (Smith); 632:3-633:1 (McGeehin); PX75 at 2-5 and Schedule 2 (McGeehin Report).

Maine Yankee sought to recover damages resulting from SWEC's non-performance, and ultimately recovered a total of $61 million.  SWEC's insurer, Federal Insurance, paid Maine Yankee $44 million that was attributed to decommissioning in the first phase of litigation.  *See Yankee Atomic*, 73 Fed. Cl. at 323.  The remaining $17 million was recovered in settling a claim with SWEC's bankruptcy estate.  *See* Tr. at 145:16-146:18 (Smith); PX41.  Based on an internal accounting model, Maine Yankee attributed about $11.6 million of the $17 million toward decommissioning, and counted the remaining approximately $5.4 million as an offset of the government's damages for ISFSI construction costs.  *See* Tr. 146:11-147:19 (Smith); PX41.  Maine Yankee's allocation decisions regarding the SWEC settlement funds, and the costs related to ISFSI construction were approved by FERC as prudent expenses.  *See* Tr. 149:18-151:25 (Smith).

After completing dry storage construction, Maine Yankee began a campaign to transfer its spent fuel from wet storage.  During the campaign, Maine Yankee incurred costs related to pool clean-up in an amount of $39,363, and damaged or reconstituted fuel in an amount of $895,191.  *See* Doc. 58 at 9.

## IV.   PLAINITFFS' COLLECTIVE LOBBYING COSTS

Plaintiffs damage claims include costs incurred for lobbying efforts in an amount of $548,433.  *See* Doc. 58 at 11; Doc. 111 at 2 n.2 (noting a reduction in the amount of contested lobbying costs from $752,503 to $548,433); Tr. at 131:19-132:4 (Smith).  This figure is divided between the utilities as follows:  $35,000 for Connecticut Yankee, $131,977 for Yankee Atomic, and $381,456 for Maine Yankee.  *See* Doc. 111 at 2 n.2.  The utilities believe they are entitled to lobbying costs because the costs would not have been incurred had the government performed.  *See* Tr. 132:22-133:1 (Smith).  Since the spent fuel remained in the ISFSIs despite decommissioning, the utilities engaged in lobbying in order to stay

informed as to the state of the industry and the dry storage requirements.  *See* Tr. at 131:19-132:4 (Smith); Tr. 274:13-275:13 (Pizzella).   The Yankees considered lobbying efforts as part of mitigation, to ensure compliance with rules and regulations relating to stored fuel.  *See* Tr. 275:20-276:3 (Pizzella); Tr. 282:1-8 (Norton).

## CONCLUSIONS OF LAW

In its *Indiana Michigan Power Co. v. United States* decision, the Federal Circuit established that damages awarded in spent nuclear fuel disputes are governed by traditional breach of contract law.  422 F.3d 1369 (Fed. Cir. 2005).  "The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been in had the breaching party fully performed."  *Id.* at 1373.   Specifically, "[d]amages for a breach of contract are recoverable where:  (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty."  *Id.* (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)).

To establish that damages were reasonably foreseeable,  "a plaintiff must show that the type of damages are foreseeable as well as the fact of damage."  *See Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee*, 683 F.3d 1330, 1344 (2012).   As the Federal Circuit has explained:

> "[D]amages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.   Restatement (Second) of Contracts § 351.  Although this does not require "actual foresight" that the breach will cause a "specific injury or a particular amount in money[,] . . . the injury actually suffered [still] must be *one of a kind that defendant had reason to foresee* and of an amount that is not beyond the bounds of reasonable prediction." Joseph M. Perillo, 11 *Corbin on Contracts* § 56.7, at 108 (rev. ed. 2005) (emphasis added). "[R]emoteness in space and time and the number of intervening events have obvious bearing on foreseeability." *Williston on Contracts* § 64:13.

*Id.*

To meet the causation requirement, plaintiffs must show that the government's breach was a "substantial causal factor" in the damages they seek to recover. *Indiana Michigan*, 422 F.3d at 1373. Although the but-for test for causation is preferred in some cases, the appropriate standard "depends upon the facts of the particular case and lies largely within the trial court's discretion." *Yankee Atomic Elec. Co.*, 536 F.3d at 1272 (citing *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007)). In the first phase of litigation, the court opted to apply the substantial factor test, and its decision was affirmed by the Federal Circuit. *See id.* at 1273.

As part of their causation argument, plaintiffs must present a "comparison between the breach and non-breach worlds." *Yankee Atomic*, 536 F.3d at 1273. The plaintiff bears the burden of proving "the extent to which his incurred costs differ from the costs he would have incurred in the nonbreach world." *Energy Nw. v. United States*, 641 F.3d 1300, 1306 (Fed. Cir. 2011).

And finally, although damages must be "shown with reasonable certainty," they need not be "ascertainable with absolute exactness or mathematical precision," but "recovery for speculative damages is precluded." *Indiana Michigan*, 422 F.3d at 1373 (citations omitted).

A similar standard applies to the recovery of mitigation damages. "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damage." *Id.* at 1375. The Circuit has explicitly stated that the mitigating party must "prove foreseeability, causation, and reasonableness." *Id.* at 1376 (denying mitigation damages on the basis that the mitigating party failed to prove foreseeability, causation, and reasonableness).[4]

---

[4] Plaintiffs cite *Southern California Edison Co. v. United States*, 93 Fed. Cl. 337, 348 (2010), for the proposition that, with respect to mitigation damages, "[t]he Government's burden is to "affirmatively establish" that the Yankees' "mitigation was inappropriate or unreasonable." *See* Doc. 116 at 12. The court in *Southern California* does in fact state that, "[a]ssuming causation, the burden then shifts to the defendant. In defending against [the utilities'] damages, the government must affirmatively establish that the mitigation was inappropriate or unreasonable." 93 Fed. Cl. 337, 348 (2010) (citing *Indiana Michigan*, 422 F.3d at 1375). This court, however, respectfully disagrees with this reading of *Indiana Michigan*, and believes that recent Federal Circuit precedent dictates that plaintiffs make an affirmative showing of reasonableness. The government may, of course, attempt to counter plaintiffs' showing of reasonableness with its

Furthermore, "reasonableness and foreseeability are separate requirements in the context of mitigation." *Vermont Yankee*, 683 F.3d at 1348. Reasonableness is not judged on the basis of whether the mitigation efforts were successful or necessary in hindsight. Plaintiffs are "not precluded from recovery . . . to the extent that [they have] made reasonable but unsuccessful efforts to avoid loss." *Yankee Atomic*, 536 F.3d at 1276 (quoting *Indiana Michigan*, 422 F.3d at 1375). When mitigation efforts are "reasonable, foreseeable, and caused by the Government's partial breach, their ultimate success and usage is irrelevant." *Id.*

## I.   ISFSI CONSTRUCTION COSTS, RELATIED MITIGATION ISSUES AND PROPER ALLOCATION OF SETTLEMENT FUNDS

Here, the utilities argue that because this court has already determined that the government's partial breach caused the need to construct dry storage, the government is responsible for all ISFSI construction costs. *See* Doc. 116 at 9 ("Given this Court's prior findings, the Yankees' burden at trial was to simply prove their costs incurred in building their ISFSIs. . . ."). The government, however, contends that its previously-established liability for construction costs should be limited in three ways. First, the government argues that the increased construction costs resulting from the terminations of Bechtel and SWEC were not foreseeable or proximately caused by DOE's delay, and therefore, are not recoverable. Second, the government claims that it should be credited additional proceeds from settlements that the utilities entered into with Bechtel and SWEC. And finally, the government argues that it should receive credit for the utilities' mistakes or omissions in mitigation.[5]  *See* Doc. 112 at 71-102.

---

own evidence and argument. *See Entergy Nuclear Vermont Yankee, LLC v. United States*, 95 Fed. Cl. 160, 184 (2010) ("Once a plaintiff demonstrates foreseeability, causation, and reasonable certainty, the defendant may eliminate or reduce the alleged damages by showing either that the "[p]laintiffs did not undertake reasonable mitigation efforts, or that the efforts they did undertake were unreasonable.") (citing *Carolina Power & Light Co. v. United States,* 82 Fed.Cl. 23, 44 (2008)), *rev'd* on other grounds, *Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee, LLC*, 683 F.3d 1330 (Fed. Cir. 2012).

[5] The government also argues that it was prejudiced due to plaintiffs' failure to produce certain documents. Because the court has already ruled on this discovery dispute, it will not revisit the issue. *See* Doc. 110 (court's ruling denying the government's motion to compel as to Connecticut Yankee); Doc. 115 (court's ruling denying the government's motion to compel as to Maine Yankee).

**A.      Foreseeability and Causation of Increased Construction Costs Due to the Government's Breach**

Connecticut Yankee and Maine Yankee hired Bechtel and SWEC to build ISFSIs in an effort to mitigate damages caused by the government's breach.  Both utilities incurred increased construction costs after terminating the contractors and assuming construction duties themselves.  *See* Tr. 243:16-244:10 (Norton); Tr. at 182:19-183:7 (Norton), Tr. at 148:11-18 (Smith).  The government challenges an award of these damages on the basis that the increased costs not foreseeable, or that DOE's delay were not the proximate cause of damages related to the contractors' terminations.  *See* Doc. 112 at 71.

**1.      Foreseeability**

Plaintiffs argue that they are not required to prove foreseeability at this stage of the proceeding because they have already proven that the need for ISFSI construction was caused by the government's breach.  *See* Doc. 116 at 9.  It is true that this court has, in fact, found that ISFSI construction was reasonably foreseeable, and that Federal Circuit affirmed this conclusion.  *Yankee Atomic*, 73 Fed. Cl. at 267 (concluding that "absent DOE performance the need to spend substantial sums for additional at-reactor storage was reasonably foreseeable at the time of contracting"); *id.* at 288 ("The court finds that substantial SNF . . . dry storage costs were reasonably foreseeable to DOE, the breaching party at the time of contracting.");  *Yankee Atomic*, 94 Fed. Cl. at 710-711 (holding that "[i]n [the] non-breach world, the Yankees' dry storage costs would have been zero because dry storage would not have been built," and noting that the Federal Circuit affirmed the "reasonableness and foreseeability" of the dry storage costs in *Yankee Atomic*, 536 F.3d 1268).

This is not, however, the end of the inquiry.  Plaintiffs have the burden of proving not only that the "injury actually suffered [is] one of a kind that the defendant had reason to foresee," but also that the loss for which it seeks to recover is "of an amount that is not beyond the bounds of reasonable prediction."  *Vermont Yankee*, 683 F.3d at 1344 (citing Joseph M. Perillo, 11 *Corbin on Contracts* § 56.7, at 108 (rev. ed. 2005)).

As an initial matter, it is clear that the government had reason to foresee that its failure to perform under the contract would cause massive difficulties for the utilities due to the nature of the nuclear fuel industry. Nuclear fuel storage is inherently a sensitive and expensive endeavor. *See Yankee Atomic*, 73 Fed. Cl. at 253 (stating that the disposal of SNF poses a "severe potential health hazard" with "complex technical problems") (citations omitted); *id.* at 251 (noting that domestic utilities were required to enter into the Standard Contracts at issue here due in part to the highly-regulated nature of the nuclear industry, and that DOE agreed to accept the fuel "in return for payment of substantial fees" by the utilities).

In addition, plaintiffs submitted evidence at trial that tends to prove that the amounts spent on ISFSI construction were reasonably foreseeable. Mr. Norton testified that, compared to other projects in the industry, the funds ultimately spent by both Connecticut Yankee and Maine Yankee were reasonable:

> Q:    If you compare the cost to what you would have considered to be the reasonable cost of doing all this work, putting to one side whatever good deal you got in the contract, would you say there were cost overruns or the project costs were unreasonable?
>
> . . .
>
> THE WITNESS:   . . . I think what you're asking me is at the end of the day is the relative cost for these projects based on the uncertainty of these projects and the nature of these projects totally unreasonable, imprudent, you know excessive, and my experience, again having terminated three licenses at three nuclear facilities, I think I have some basis for concluding that even though there were cost increases when you compare it to the value that we were trying to ascertain from the DOC we lost some of that value from that fixed-price contract that we had and some of that protection.
>
> But at the end of the day when you look at some of the projects in the industry that never had a DOC contract and compare them, I don't believe you could draw the conclusion that our price[s] were unreasonable at ISFSI or otherwise.

Tr. 254:9-255:11 (Norton).   Also, FERC approved as prudent both Connecticut Yankee's termination of and settlement with Bechtel and Maine Yankee's termination of and settlement with SWEC, demonstrating that the utilities' mitigation decisions were within reasonable bounds.  *See* Tr. 195:11-17 (Norton); Tr. 149:18-151:20 (Smith).

The government did not offer any evidence that the magnitude of the increased costs was unforeseeable.   Instead, it argues that because the increased costs were caused by Bechtel and SWEC, any increase at all was not foreseeable at the time of contracting.  *See* Doc. 112 at 79-82, 88-90.   This argument conflates that foreseeability analysis with the causation analysis, but in any event does not effectively counter plaintiffs' evidence.   The court is also mindful of the fact that plaintiffs should not be penalized for the fact that reasonably undertaken mitigation was ultimately unsuccessful.  *See  Yankee Atomic*, 536 F.3d at 1276 (stating that plaintiffs are "not precluded from recovery . . . to the extent that [they have] made reasonable but unsuccessful efforts to avoid loss") (citing *Indiana Michigan*, 422 F.3d at 1375).

The government had reason to foresee both the losses that would result from its breach and that any such losses would likely have substantial associated costs. Because there is no requirement that a specific injury or particular amount of money be foreseeable, plaintiffs have carried their burden.

## 2. Causation

As noted above, in order to meet the causation requirement, plaintiffs must show that the government's breach was a "substantial causal factor" in the damages they seek to recover.  *Indiana Michigan*, 422 F.3d at 1373.   The government argues that, "[f]or an injury to be foreseeable, it must be 'the natural and proximate result of the breach,' and '[t]here must be no intervening efficient cause.'"   Doc. 112 at 79 (citing *Locke v. United States*, 151 Ct. Cl. 262, 270 (1960)).   The government, however, fails to include the entire standard cited in *Locke.*  The court continues: "The injury may be only indirectly produced but it yet must be capable of being traced to the breach with reasonable certainty." *Locke*, 151 Ct. Cl. at 270.

Here, it is clear that Connecticut Yankee and Maine Yankee hired Bechtel and SWEC to assist with ISFSI construction, which would have been entirely

15

unnecessary if the government had performed its obligations under the contract.  In other words, the losses sustained by the utilities due to the contractors' terminations can be "traced to [the government's] breach with reasonable certainty."  The government essentially argues, however, that the contractors' terminations amount to intervening causes that break the causal chains, relieving it of responsibility for the increased construction costs.

The court disagrees.  More than one hundred years ago, the United States Court of Claims issued its decision in *Myerle v. United States*, a case which is still commonly cited for the rule it set forth governing intervening cause.  33 Ct. Cl. 1 (1897).  The court held that a "plaintiff can only recover those items of damage which are the proximate result of the acts of the Government . . . For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage . . . There must not be two steps between cause and damage."  *Id.* at 27.  The court elaborated on this rule in *Maclay v. United States*:

> When it is said that the cause to be sought is the direct and proximate cause, it is not meant that the cause of agency which is nearest in time or place to the result is necessarily to be chosen. The active efficient cause that sets in motion a train of events which brings about a result without the intervention of any force started and working actively from a new and independent source is the direct and proximate cause . . .

43 Ct. Cl. 90, 97-98 (1908) (citations omitted).

The requirement that no intervening incident interrupt causation is a real limitation.  In *Locke v. United States*, for example, the plaintiff sued the government for breach of one contract for the repair of typewriters in California, and for the government's allegedly improper refusal to enter a second contract for the same services in Texas.  151 Ct. Cl. 262.  The plaintiff argued that his "failure to obtain the Texas contract was a direct result of the Government's breach of the California contract," and sought damages resulting from denial of the Texas contract as flowing from the breach of the California contract.  *Id.* at 270.  The court found that because, wholly apart from the breach of the California contract,

sufficient evidence supported denial of the Texas contract, the government was not responsible for any resulting losses.  *Id.* at 271.

And more recently, in *Hughes Communications Galaxy, Inc. v. United States*, the Federal Circuit reaffirmed use of the *Myerle* rule.  271 F.3d 1060, 1071 (Fed. Cir. 2001).  In *Hughes*, the plaintiff entered into a contract with the government under which NASA agreed to use its "best efforts" to launch ten of Hughes's satellites on space shuttles.  *Id.* at 1064.  Following the Challenger shuttle explosion in 1986, NASA informed Hughes that it would not launch its satellites.  *Id.*  Hughes sought alternatives for launching the satellites, but incurred more costs than it would have under the contract in the process.  As part of the damages it sought, Hughes claimed that it was entitled to recover increased launch insurance costs.  *Id.* at 1065.  The trial court found that Hughes was not required under the contract to purchase launch insurance, but purchased the insurance as an independent business decision.  *Id.* 1071.  As such, the Federal Circuit affirmed the trial court's conclusion that Hughes' independent business decision to purchase insurance was an intervening cause preventing it from recovering the increased insurance costs as a result of the breach of contract.  *Id.*

This case is fundamentally different from cases like *Locke* or *Hughes*.  In both of those cases, plaintiffs were denied damages that resulted from totally independent sources than the government's original breach.  Here, the termination of Bechtel's and SWEC's contracts are not so independent.  Connecticut Yankee and Maine Yankee only incurred the damages resulting from Bechtel's and SWEC's terminations because the government's breaches necessitated hiring Bechtel and SWEC in the first instance.  Put another way, the government's breach was the "active efficient cause that set[] in motion a train of events which [brought] about a result without the intervention of any force started and working actively from a new and independent source."  *Maclay*, 43 Ct. Cl. at 97-98 (citations omitted).

The court agrees with plaintiffs that the government's position leads to an incongruous result.  As plaintiffs observed, "parties who are forced to mitigate would be unable to recover all reasonable mitigation costs unless the mitigation activity was carried out perfectly and went exactly as planned."  Doc. 116 at 11.  The government's position is contrary to the rule stated by the Federal Circuit earlier in this litigation, that plaintiffs are "not precluded from recovery . . . to the

extent that [they have] made reasonable but unsuccessful efforts to avoid loss." *Yankee Atomic*, 536 F.3d at 1276 (citing *Indiana Michigan*, 422 F.3d at 1375). And perhaps more fundamentally, the government's position is contrary the foundational rule of breach of contract recovery, that "[t]he remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been in had the breaching party fully performed." *Indiana Michigan,*422 F.3d at 1373. Unquestionably, had the government performed its duties under the contract, plaintiffs would not have incurred any of the costs associated with ISFSI construction, including those resulting from the terminations of Bechtel and SWEC. *See Yankee Atomic*, 94 Fed. Cl. at 710 ("In [the] non-breach world, the Yankees' dry storage costs would have been zero because dry storage would not have been built.").

The court, therefore, concludes that the damages resulting from the terminations of Bechtel's and SWEC's contracts were proximately caused by the government's breach of contract.

### B.     Reductions for Mistakes or Omissions in Mitigation

### 1.     Connecticut Yankee

The government challenges Connecticut Yankee's mitigation efforts as insufficient, arguing that it should not be held responsible for the cost increases that could have been offset by proper mitigation. *See* Doc. 112 at 82-85. Specifically:

> The Government does not challenge as unreasonable Connecticut Yankee's initial decision to contract with Bechtel or Connecticut Yankee's decision to terminate Bechtel. It was, however, unreasonable for Connecticut Yankee to settle its claims against Bechtel for $15 million, without correspondingly crediting the full $15 million or some other lesser amount to its ISFSI-construction costs, despite its acknowledgement that the termination caused delay and disruption on the project and the ultimate cost of the project was almost twice the original contract amount ($108.7 million versus $55.7 million).

Doc. 112 at 84.

Here, Connecticut Yankee's decision to hire Bechtel was an appropriate and reasonable attempt at mitigation, even by the government's standards. As established above, those efforts were both foreseeable and caused by the government's breach. And as previously stated, plaintiffs are not required to perform mitigation efforts perfectly in order to recover. *See Yankee Atomic*, 536 F.3d at 1276 (When mitigation efforts are "reasonable, foreseeable, and caused by the Government's partial breach, their ultimate success and usage is irrelevant.").

The government argues that "[i]f Connecticut Yankee was unable to negotiate a settlement agreement with Bechtel that provided compensation for the full amount of the loss, Connecticut Yankee should have continued to pursue its counterclaim against Bechtel to recover the full amount attributable to the disruption caused by Bechtel's termination." Doc. 112 at 84. This argument ignores the realities of litigation. That settlement is sometimes—even often—a wise decision, is axiomatic.

In addition, the record supports Connecticut Yankee's actions. First, the settlement was recommended by a professional mediator, who had all the facts available for consideration. *See* Tr. at 192:8-12 (Norton). Second, FERC regulators blessed the settlement as prudent. *See* Tr. 195:11-17 (Norton). And, although the government has complained at length that Connecticut Yankee failed to turn over important documents in discovery that would have assisted in its assessment of the Bechtel settlement, *see, e.g.,* Doc. 112 at 71-77, the court found that not to be the case, *see* Doc. 110, and the government admitted at trial that it made no attempt to contact anyone from Bechtel to find the information it sought, *see* Tr. at 15:16-18.

Furthermore, the government's argument on this point presents no actual challenge to Connecticut Yankee's actions, and does nothing more than repackage its allocation argument, which will be addressed below. The court, therefore, finds no merit in its protest of Connecticut Yankee's mitigation efforts.

## 2. Maine Yankee

The government's argument that Maine Yankee failed to mitigate its losses is perfunctory, at best. *See* Doc. 112 at 90-91. It claims vaguely that "[h]aving

failed to take reasonable efforts to recover the increased costs from SWEC, Maine Yankee cannot now transfer to the Government the additional costs resulting from the termination of SWEC," but fails to identify what action or inaction it considers unreasonable.  Doc. 112 at 90.  This argument simply recasts the government's causation argument, which the court has already addressed.  And again, Maine Yankee is not precluded from recovering even assuming its mitigation efforts were flawed.  *See Yankee Atomic*, 536 F.3d at 1276 (When mitigation efforts are "reasonable, foreseeable, and caused by the Government's partial breach, their ultimate success and usage is irrelevant.").

### 3.   Yankee Atomic

The government also claims that Yankee Atomic cannot recover three months of wet pool storage costs because the fuel transfer campaign was delayed by three months due to the actions (or inactions) of its contractor NAC.  *See* Doc. 112 at 101-102.  As an initial line of defense to this claim, plaintiffs take the position that the government waived this argument by failing to raise it before now.  *See* Doc. 116 at 47.  The court tends to agree,  despite the fact that plaintiffs failed to cite any authority on point.  *See Suess v. United States*, 97 Fed. Cl. 564, 567 (Fed. Cl. 2011) ("[I]t has been held that a litigant must describe all its theories of defense or recovery during the pretrial conference, in its pretrial briefing or they will be waived."); *Cinergy Corp. v. United States*, 55 Fed. Cl. 489, 499 n.12 (2003) ("[B]y failing to raise this issue earlier so as to allow for its proper development at trial, plaintiff has waived any entitlement to deduct this amount.").

Even assuming the issue was not waived, however, the government has failed to raise a valid defense to paying those three months of Yankee Atomic wet pool costs.  As with its challenges to Connecticut Yankee's and Maine Yankee's mitigation efforts, the government has repurposed a previously exhausted argument.  It states:  "The additional costs of wet pool storage attributable to the delays by NAC were not caused by DOE's delay and should not be recovered as damages.  In addition, Yankee Atomic cannot establish that DOE could have foreseen that NAC would have delayed the loading of fuel to Yankee Atomic's ISFSI."  Doc. 112 at 102.  The court has already dispatched the government's challenges on the grounds of foreseeability and causation, and will not repeat its reasoning here.

### C.     Proper Allocation of Settlement Proceeds

When a breach of contract results in a benefit as well as a loss to the non-breaching party, the benefit must be credited when calculating damages from the breach.  *See Kansas Gas and Elec. Co. v. United States*, 685 F.3d 1361, 1367 (Fed. Cir. 2012) ("Thus, 'where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon plaintiff which he would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages.'") (quoting *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed. Cir. 2003)).  Here, the government claims that it has not received proper credit for the sums recovered by Connecticut Yankee and Maine Yankee from Bechtel and SWEC, respectively.  *See* Doc. 112 at 85, 91.  The court will address each utility's settlement allocations separately.

### 1.     Connecticut Yankee

Following the government's breach of its contract with Connecticut Yankee, the utility contracted with Bechtel for decommissioning and ISFSI construction work.  Under the contract, Bechtel was to complete the project for a total of $240 million, with approximately $187 million related to decommissioning, and the remaining $53 million for ISFSI construction.  *See* PX53 at CY0000311 (items 17 and 18); Doc. 111 at 27.  Connecticut Yankee terminated the Bechtel contract for Bechtel's failure to perform.  *Yankee Atomic*, 73 Fed. Cl. at 292.

After Connecticut Yankee terminated the contract, Bechtel sued, and Connecticut Yankee counterclaimed.  Tr. at 187:18-189:18 (Norton).   On the advice of a professional mediator, the parties settled under an arrangement that required Bechtel to pay Connecticut Yankee $15 million.  *See* PX57 at CY0145691; Tr. at 192:8-12 (Norton).   In its internal accounting system, Connecticut Yankee chose to place the $15 million recovery into decommissioning trust.  *See* Tr. 136:12-139:19; Tr. at 175:16-176:6 (Smith); PX57 at CY0145691.

Connecticut Yankee argues, first, that it was entitled to allocate the entire settlement to decommissioning costs because the decommissioning cost overruns exceeded the settlement amount.  *See* Doc. 111 at 31; Tr. 134:10-136:4 (Smith).  As an alternative justification for not allocating any of the $15 million to offset its

ISFSI construction costs, Connecticut Yankee argues that it was not required to do so because the $15 million recovery was less than the $15.3 million it spent in attorneys' fees during the dispute with Bechtel. *See* Doc. 111 at 31; Tr. at 175:23-176:6 (Smith); Tr. at 269:18-270:1 (Pizzella).

The government attacks Connecticut Yankee's reasoning on the bases that: (1) attorneys' fees are not recoverable against the government, and (2) the evidence offered by plaintiffs is insufficient to support an award of fees. *See* Doc. 112 at 85-87. The government does not substantively comment on the propriety of allocating the entire recovery to decommissioning.

In the earlier phase of this litigation, the court permitted Maine Yankee to allocate $44 million to decommissioning because plaintiff supported its allocation with unrebutted testimony relating to rate-payer benefits that the court found credible. *See Yankee Atomic*, 73 Fed. Cl. at 323. Here, however, Connecticut Yankee has offered no evidence that crediting the $15 million settlement to decommissioning was proper, which prevents the court from evaluating whether its decision was reasonable. The court, therefore, will not assume that the $15 million settlement should be credited entirely toward decommissioning.

Connecticut Yankee's alternative argument, that it was not required to credit the settlement proceeds as an offset to damages because it spent more on litigation fees than it recovered, has no traction. As an initial matter, Connecticut Yankee has made no claim for attorneys' fees from the Bechtel litigation in this case. The fees are, therefore, not damages that this court has the authority to offset. Moreover, absent a reasonable justification for attributing the costs to decommissioning, Connecticut Yankee must credit the settlement proceeds related to ISFSI construction against the damages it recovers from the government for its breach. *See Kansas Gas*, 685 F.3d at 1367. Connecticut Yankee's refusal to divide either the alleged litigation costs or the settlement proceeds between the two issues presents the court with a difficult conundrum. And unfortunately, the government offers no workable method for categorizing the fees, and argues only that the utility should credit "the full $15 million or some other lesser amount to its ISFSI-construction costs." *See* Doc. 112 at 84.

Despite the fact that neither party has provided the court with a solution for dividing the Bechtel recovery between decommissioning costs and ISFSI

construction costs, both the law and considerations of equity require that some credit be given. Therefore, in the absence of any more accurate or practical method, the court finds that the $15 million settlement proceeds should be divided in accordance with the percentages each part of the work represented in the original contract price.

The full contract price was $240 million, with approximately $187 million related to decommissioning, and the remaining $53 million for ISFSI construction. Because the construction costs represent approximately 22% of the contract price, $3.3 million, 22% of $15 million, will be credited against Connecticut Yankee's recovery in this case.

## 2.   Maine Yankee

Following the government's breach, Maine Yankee contracted with SWEC to perform decommissioning and ISFSI construction services. The contract price was $252 million, with $195.3 million attributed to decommissioning work, and the remaining $56.7 million to ISFSI construction. *In re Stone & Webster, Inc.*, 279 B.R. 748, 757 (Bankr. D. Del. 2002); PX75 at 4 and Schedule 2 (McGeehin Report). SWEC fell behind on work, and eventually became insolvent. *See Yankee Atomic*, 73 Fed. Cl. at 285. As a result, Maine Yankee terminated the contract, and performed the work itself. *See id.*; Tr. at 182:15-183:11 (Norton).

Maine Yankee sought recovery of its damages from both SWEC and its bonding company, Federal Insurance, and recovered $44 million in decommissioning costs. *Yankee Atomic*, 73 Fed. Cl. at 323. The United States Bankruptcy Court for the District of Delaware held that Maine Yankee was entitled to an additional $20.8 million. *In re Stone & Webster, Inc.*, 279 B.R. at 809. Maine Yankee settled the additional claim with SWEC's bankruptcy estate for approximately $17 million, for a total recovery of $61 million. *See* Tr. at 145:16-146:18 (Smith); PX41.

According to internal accounting procedures, Maine Yankee allocated approximately $11.6 million of the additional $17 million recovery to decommissioning, and the remaining $5.4 million to ISFSI construction. *See* Tr. at 145:16-147:19 (Smith); PX41. The $5.4 million was, in turn, credited against Maine Yankee's claim in this case. *See* Tr. at 147:3-5 (Smith). Notably, the

Federal Energy Regulatory Commission not only reviewed and approved these allocation decisions, but also found that SWEC's termination was prudent and that costs subsequently incurred for ISFSI construction were reasonable.  *See* Tr. at 149:18-151:4 (Smith).

The government challenges Maine Yankee's allocation of the settlement proceeds, claiming that Maine Yankee's calculation is mathematically incorrect, and that it is not based on sound methodology.  *See* Doc. 112 at 95; Tr. at 481:6-17 (Johnson).[6]  After extensive machinations and criticisms of Maine Yankee's accounting methods, *see generally*, Tr. at 478:3-502:7 (Johnson), the government's expert concludes that 22% of the $61 million settlement proceeds should be apportioned to ISFSI construction.  *See* Tr. at 489:15-490:2 (Johnson).  The government, however, glosses over the fact that $44 million of the settlement is not at issue in this claim period, and in fact, its allocation was approved by this court in the first claim period, and was not disturbed on appeal.  *See Yankee Atomic*, 73 Fed. Cl. at 323.  The government cannot re-open the issue of allocation as to those funds.

Moreover, applying the government's own logic to the remaining $17 million, and calculating its offset as 22% of that figure, would result in a credit of $3.74 million.  *See* Tr. at 628:18-629:3 (McGeehin).  Because this figure is well-below the $5.4 million that Maine Yankee has already allocated, the court denies the government's claim to an additional credit.  The court will, however, hold Maine Yankee to its $5.4 million figure.

## II.    RECOVERY OF WET POOL OPERATIONAL COSTS

Plaintiffs may only recover costs caused by the government's breach if those costs would not have been incurred in the non-breach world.  *See Indiana Michigan*, 422 F.3d at 1373 ("The remedy for breach of contract is damages

---

[6] The government also argues that in order to prevent a double recovery, $13.4 million of the additional $17 million recovered in the instant claim period should be allocated to ISFSI construction.  *See* Tr. at 481:6-482:3; 482:16-25; 490:3-491:2 (Johnson).  The notion of a double recovery is inapplicable here, however, because the actual cost overruns on decommissioning amounted to $129.5 million, but Maine Yankee only recovered a total of $61 million.  *See* Tr. at 148:11-18 (Smith); 632:3-633:1 (McGeehin); PX75 at 2-5 and Schedule 2 (McGeehin Report).  Therefore, regardless of how much of the $61 million is allocated to decommissioning costs, Maine Yankee will not recover more than it spent.

sufficient to place the injured party in as good a position as it would have been in had the breaching party fully performed."); *Energy Nw.*, 641 F.3d at 1306 (noting that the plaintiff bears the burden of proving "the extent to which his incurred costs differ from the costs he would have incurred in the nonbreach world").  Here, the parties disagree about the costs plaintiffs would have incurred in a non-breach world for the operation of their wet pools.  The government contends that under the terms of the contracts, it was required to remove the last of Yankee Atomic's SNF by the end of 1999,[7] Connecticut Yankee's SNF by the end of 2002, and Maine Yankee's SNF by the end of 2004.  *See* Doc. 112 at 58, 63; *see also Yankee Atomic*, 94 Fed. Cl. at 693.  Under the government's theory, the plaintiffs would only be entitled to damages for wet pool storage costs incurred beyond those dates, and any time saved should result in avoided costs, working in the government's favor.  *See* Doc. 112 at 60.

Connecticut Yankee actually emptied its wet pools on March 30, 2005, more than three years after the government claims it would have been contractually bound to remove the fuel.   *See* Tr. at 117:4 (Smith).  Plaintiffs' expert concluded that in a non-breach world, DOE would have picked up Connecticut Yankee's SNF over the course of 2001 and 2002.  *See* Tr. at 321:24-322:2 (Graves).  Specifically, he testified that 17% of the SNF would have been accepted in 2001, and the remaining 83% in 2002.  *See* Tr. at 321:24-322:8 (Graves).   Reasoning that DOE would have accepted the SNF at approximately the same rate that Connecticut Yankee actually transferred it, he opined that in the non-breach world, Connecticut Yankee would have ceased wet pool operations by September 29, 2002.  *See* Tr. at 322:14-16 (Graves).  Thus, the argument goes, Connecticut Yankee incurred three additional months of wet pool storage in 2002 (from October to December) than it would have had the government performed.  *See* Doc. 111 at 40.  Connecticut Yankee seeks to recover $3,171,342 in compensation for those three months of storage.  *See* Doc. 58 at 8.

Plaintiffs ask the court to accept the same assumption with regard to Maine Yankee's fuel-out date.  Maine Yankee emptied its wet pools on February 27, 2004, approximately ten months before the government argues it would have been

---

[7] The government does not challenge Yankee Atomic's claim for wet pool operational costs.  It appears that Yankee Atomic's wet pool operations ceased sometime in 2003, *see* PX005F (spreadsheet showing wet pool operational costs ending in 2003), but no specific date was provided at trial.

contractually bound to pick up the SNF.  *See* Tr. at 111:6-20 (Smith); Tr. at 313:5-22 (Graves); PX65A; PX73 at 9-10 and Figure 5 (Graves Report).  Maine Yankee's expert testified that, in the non-breach world, DOE would have picked up the final 42% of Maine Yankee's SNF in 2004.  *See* Tr. at 313:17-22 (Graves). He further testified that because it took Maine Yankee 174 days to move 42% of its SNF, the court should find that the government would have completed its work in the non-breach world by the 174th day 2004, or June 22nd.  *See* Tr. at 314:7-19 (Graves).  Both parties contend that Maine Yankee avoided some operational costs by completing its transfer campaign in February, but they disagree as to the amount.  Under the plaintiffs' theory, the government would receive credit of approximately four months of avoided costs (from February to June), *see* Doc. 111 at 37, while the government argues it should receive credit for ten months of avoided costs (from February to December).  *See* Doc. 112 at 60.  Four months of avoided costs would result in a credit to the government in an amount of $1,646,180, and ten months of avoided costs would result in a credit to the government in an amount of $4,115,446.  *See* Doc. 58 at 7-8.

Plaintiffs' argument, however, is misguided.  The scope of the government's liability is determined by its obligation under the contract—not by the time in which it theoretically could have performed.  *See* Tr. at 343:9-12 (Graves) (Plaintiffs' expert is answering the wrong question when he states that: "What we're going to do is impute a date to [sic] likely acceptance.").

As an initial matter, the court will not revisit the fuel-out dates that it has already settled.  *Suel v. Sec'y of Health and Human Servs.*, 192 F.3d 981, 984-85 (Fed. Cir. 1999) (noting that under the law of the case doctrine, "a court will generally refuse to reopen or reconsider what has already been decided at an earlier stage of the litigation").[8]  Following the first trial in this matter, the Federal Circuit reversed this court, in part, and remanded the case with instructions to establish a timetable for assessing causation.  *See Yankee Atomic*, 536 F.3d at 1273 ("The

---

[8] In *Gould, Inc. v. United States,* the Federal Circuit cited several exceptions to the law of the case doctrine.  "Under this doctrine a court adheres to a decision in a prior appeal in the same case unless one of three exceptional circumstances exist: (1) the evidence in a subsequent trial is substantially different; (2) controlling authority has since made a contrary decision of the law applicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice."  67 F.3d 925, 930 (Fed. Cir. 1995).  None of these exceptions apply to the case at bar.

fundamental causation difficulty in this contract is the absence of an explicit SNF . . . acceptance rate or time table. Without an express timetable for removal of the Yankees' waste in the event the Government had kept its bargain, the Yankees cannot show the expenses they might have avoided."); *id.* at 1274 (directing this court to "apply the Standard Contract acceptance rate identified in *Pacific Gas* to assess causation"). This court carried out the Circuit's instructions, and after hearing extensive evidence, including voluminous expert testimony, came to the following conclusion:

> Crediting preponderant evidence, the court concludes that the Yankees would not have built dry storage in the non-breach world. In the hypothetical world of full government performance, at the 1987 [Annual Capacity Report] rates, the Yankees would have purchased, sold or exchanged approved allocations which, when used in combination with the original approved allocations, would have resulted in all SNF removed from Yankee Atomic's wet pool by the end of 1999; from Connecticut Yankee's wet pool by the end of 2002; and from Maine Yankee's wet pool by the end of 2004. With those fuel-out dates, the Yankees would not have built dry storage, and consequently would not have incurred the dry storage costs awarded in *Yankee I*, and an award of that quantum will not put the Yankees in a better position than if DOE had not partially breached.

*Yankee Atomic*, 94 Fed. Cl. at 693. In the appeal that followed, the Federal Circuit specifically affirmed this court's decision. *See Yankee Atomic*, 679 F.3d at 1360 (stating that "this court affirms the trial court's factual determination and award of damages based on an exchanges model").

Even assuming, however, that rehashing this issue is appropriate, plaintiffs have failed to prove the reasonableness of the fuel-out dates they propose. Plaintiffs' expert bases his opinion on the fundamental and unsupported assumption that the government would have accomplished its work in the same amount of time that the utilities did. *See* Tr. at 314:7-19; 322:11-16 (Graves). DOE has contracts with numerous utilities across the country under which it is obligated to accept and dispose of SNF. *See Yankee Atomic,* 73 Fed. Cl. at 251 ("In 1983, pursuant to the Nuclear Waste Policy Act of 1982 ("NWPA"), . . . plaintiffs, *along with all domestic nuclear utilities*, entered into Standard Contracts

with DOE wherein, in return for payment of substantial fees, DOE would accept title to, transport, and dispose of the utilities' SNF . . . .") (emphasis added).  To credit plaintiffs' assumption would be to ignore the requirements and difficulties that would inevitably arise in managing each utility's needs and scheduling under each of the contracts.  Perhaps if DOE had *only* Connecticut Yankee and Maine Yankee to serve, an equal acceptance rate could be assumed.  But that is simply not the case.

The proper fuel-out dates relevant for calculating damages remain unchanged from the dates this court previously set—by the end of 2002 for Connecticut Yankee and by the end of 2004 for Maine Yankee.  Therefore, plaintiffs may only recover for wet pool operational costs incurred beyond those dates.  As such, Connecticut Yankee may not recover operational costs for October through December, 2002.

The court's decision not to revisit the fuel-out dates determined in the earlier phase of litigation also impacts the government's avoidance argument as to Maine Yankee's costs.  The government was bound under the contract to remove the last of Maine Yankee's SNF by the end of 2004. *See Yankee Atomic*, 94 Fed. Cl. at 693.  Because the government could have met this contractual obligation by removing the fuel at any point before the deadline, it cannot fairly be said that there was a corresponding duty for Maine Yankee to pay for storage through December 31, 2004.  If Maine Yankee had no contractual duty to pay for storage through December 31, 2004, and rather was only required to pay for wet pool storage until the fuel was removed from the wet pool, it did not avoid any costs under the contract when the fuel was removed before the end of the year.  Thus, the government is not entitled to either a four-month or a ten-month credit against the damages it owes.

## III.   RECOVERY OF COSTS RELATED TO TRANSFER CAMPAIGNS

The government claims that plaintiffs should not recover costs relating to the transfer campaigns because the plaintiffs failed to prove that "the costs that they incurred to load fuel to containers in the actual world would not have been required by the contract to load fuel to DOE in the non-breach world."  Doc. 112 at 29.  Plaintiffs argue that they should recover the costs and that "[r]eduction of the Yankees' claims for the costs associated with [fuel characterization, damaged fuel

cans and fuel reconstitution, spent fuel pool clean-up, underwater camera and lighting and crane upgrades] is not appropriate because the same or similar activities and equipment may be required again in the future, when the Government performs its obligations under the Standard Contract." Doc. 111 at 47. In making this argument, plaintiffs rely on *Carolina Power & Light Co. v. United States*, 573 F.3d 1271 (Fed. Cir. 2009).

In *Carolina Power*, the government argued that because of its breach, the plaintiff avoided the costs of transferring fuel to DOE casks, that it otherwise would have incurred had the government performed under the contract. *See id.* at 1277. The court declined to speculate about plaintiff's future costs, and denied the government's request for an offset as premature. *See id.* ("Just as the utilities cannot now collect damages not yet incurred under the ongoing contract, the government cannot prematurely claim a payment that has not become due.") (quoting *Yankee Atomic*, 536 F.3d at 1281).

On this basis, plaintiffs ask the court to find that the above-listed costs, despite having been actually incurred, are considered deferred for purposes of the damages calculation, given the uncertainty of repetitive future costs. But a case in which the government seeks to avoid responsibility for costs not yet incurred is fundamentally different from a case where the plaintiffs seek to avoid responsibility for proving that actually-incurred damages were caused by the government's breach and are recoverable.

The Federal Circuit's opinion in *Energy Northwest v. United States*, is particularly instructive on this point. 641 F.3d 1300 (Fed. Cir. 2011). In *Energy Northwest*, the plaintiff utility sought to recover the cost of plant modifications in a suit for damages due to the government's breach. *Id.* at 1305. The government, following the approach in *Yankee Atomic*, 536 F.3d 1268, argued that the plaintiff failed to carry its burden to demonstrate that the modification costs would not have been incurred in the non-breach world. *Id.* The plaintiff, however, reasoned that "the issue is not whether the modification costs would have been incurred in a hypothetical non-breach world, but whether they will be incurred again in the future, when DOE ultimately performs and begins accepting the . . . SNF." *Id.*

The Circuit characterized the different approaches as follows:

> These cases address separate aspects of the damages analysis. *Yankee Atomic* shows the importance of proving causation by comparing a hypothetical "but for" world to a plaintiff's actual costs. 536 F.3d at 1273-74. Under its rule, *a plaintiff* must prove the extent to which his incurred costs differ from the costs he would have incurred in the non-breach world. *Carolina Power* addresses the separate circumstance where *a breaching party* seeks to offset an award by proving that the non-breaching party has achieved some cost savings because the breach permitted it to avoid—not just defer—some aspect of performance. 573 F.3d at 1277.

*Id.* at 1306-1307 (emphasis added). The court agreed with the government, holding that "[b]efore considering any offsets to the award, the trial court had an obligation to first establish that the entire awarded damages were actually caused by the breach," and that the plaintiff had an "obligation to prove the recoverable costs associated with that construction," noting that "[i]f a cost would have been incurred even in the non-breach world, it is not recoverable." *Id.* at 1307.

Here, plaintiffs improperly attempt to apply to their own proof of damages a rule governing the breaching party's burden to prove entitlement to an offset against those damages. The *Carolina Power* analysis simply does not apply to plaintiffs' damages in this instance.

This conclusion is bolstered by the Circuit's recent decision in *Vermont Yankee Nuclear Power Corp. v. Entergy Nuclear Vermont Yankee*, 683 F.3d 1330 (Fed. Cir. 2012). In *Vermont Yankee*, the plaintiff utility claimed that it should be credited for costs relating to fuel characterization in preparing SNF for dry storage, reasoning "that the fuel characterization may well be required a second time . . . when and if DOE performs." *Id.* at 1350. The court denied plaintiffs claim for deferred damages because the utility failed to "establish a likelihood" that further characterization would be required, and also failed to present a hypothetical model for costs that would arise from DOE's future requirement of additional characterization. *Id.* *See also Energy Nw.* 641 F.3d at 1305 (holding that the plaintiff is clearly required to "submit a hypothetical model establishing what its costs would have been in the absence of breach"); *Bluebonnet Sav. Bank FSB v. United States*, 67 Fed. Cl. 231, 238 (2005) ("[B]ecause plaintiffs in this case are

seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world.").

Therefore, in order to recover damages associated with fuel characterization, damaged fuel cans and fuel reconstitution, spent fuel pool clean-up, underwater camera and lighting, and crane upgrades, plaintiffs must demonstrate that the costs would not have been incurred in the non-breach world, and must present a model of what their costs would have been.  Unfortunately for plaintiffs, they made no such showing at trial.  Two of plaintiffs' witnesses, Mr. Todd Smith and Mr. Wayne Norton, admitted that they did not consider what costs the utilities would have incurred with respect to the transfer campaigns had the government performed.  *See* Tr. at 161:16-166:3 (Smith); Tr. at 223:21-224:7 (Norton).  In fact, the only evidence of what costs might have been incurred in the non-breach world were repeated admissions by plaintiffs' witnesses that similar costs and similar activities would have been required had the government performed.  *See* Tr. at 223:7-9 (Norton) (general acknowledgement that modifications would have been required); 224:1-7 (Norton) (general acknowledgement that modifications would have been required); 225:9-226:20 (Norton) (crane upgrades); 229:13-17 (Norton) (roof hatch); 232:5-17 (fuel characterization); 232:18-22 (Norton) (underwater camera); 233:13-16 (Norton) (damaged fuel); 234:10-13 (Norton) (pool cleaning); PX75 at 10 (McGeehin Report) (stating that the same costs would have been incurred for pool clean-up had the government performed, but those costs would have been incurred in 2001 and 2002).  In addition to the admissions of plaintiffs' witnesses, the government's witness, Mr. Keith Brewer, testified that the expenses incurred would have been necessary had DOE performed.  *See* Tr. at 399:12-15, 401:12-21 (crane upgrade); 403:21-404:6 (pool cleaning); 404:10-405:13 (underwater cameras and lighting); 407:17-22 (fuel characterization); 410:19-411:5 (fuel reconstitution).

Plaintiffs alternatively argue that to the extent transfer campaign costs would have been incurred in the non-breach world, the costs would have been incurred during the earlier phase of litigation.  *See* Doc. 111 at 42 (fuel characterization), 43 (damaged fuel, pool clean-up), 44 (underwater camera and lighting), 45 (crane upgrade).  Because the costs would have been incurred earlier, plaintiffs contend, "the Government had an opportunity to seek offsets for costs that would have been incurred in the non-breach world in those same, earlier years," and reductions for those costs should not be permitted now.  Doc. 111 at 47.  In making this

argument, plaintiffs attempt to apply the *Indiana Michigan* rule that plaintiffs must bring separate suits for future damages to mean that costs that would have been incurred at an earlier time in the non-breach world must be claimed as an offset before those costs are actually claimed as damages. *See* Doc. 111 at 51.

In *Indiana Michigan*, the court stated that: "Because of its highly speculative nature, a claimant may not recover, at the time of the first suit for partial breach, prospective damages for anticipated future nonperformance resulting from the same partial breach."   422 F.3d at 1376.   As an initial matter, this rule governs when a claimant may present a claim for damages, and says nothing about when the defendant must seek an offset.   Moreover, applying the rule in the manner advocated by plaintiffs violates the purpose of the rule, and encourages defendants to speculate as to what damages plaintiffs may later claim.   The court declines to impose such a requirement on defendants.

Plaintiffs have not carried their burden to prove they are entitled to costs associated with the transfer campaigns, and therefore, cannot recover sums spent on fuel characterization, damaged fuel cans and fuel reconstitution, spent fuel pool clean-up, underwater cameras and lighting, or crane upgrades.

## IV.   Lobbying Costs

Plaintiffs claim that they are entitled to recover costs incurred for lobbying efforts in an amount of $548,433.   *See* Doc. 58 at 11; Doc. 111 at 2 n.2 (noting a reduction in the amount of contested lobbying costs from $752,503 to $548,433); Tr. at 131:19-132:4 (Smith).   This figure is divided between the utilities as follows: $35,000 for Connecticut Yankee, $131,977 for Yankee Atomic, and $381,456 for Maine Yankee.   *See* Doc. 111 at 2 n.2.   The government raises three objections: (1) that the expenditures were not foreseeable as a result of its breach; (2) that the expenditures were not caused by its breach; and (3) that lobbying costs are not recoverable against the government.   *See* Doc. 112 at 54.

Taking the last objection first, the court does not agree that lobbying costs cannot be recovered as a matter of law. To support this proposition, the government cites to a variety of regulations and statutes that do not apply in this case, and that apparently do not categorically deny lobbying costs. *See* Doc. 112 at 54-56 (citing regulations prohibiting some lobbying reimbursements on

Department of Defense contracts, NASA procurement contracts, General Services Administration procurement contracts, contracts governed by the Federal Acquisition Regulations, DOE management and operations contracts, and Office of Management and Budget contracts).   The government admits that it has "not located a particular statute specifically addressing lobbying costs under the SNF disposal contracts," and instead argues that the court should follow the general principle gleaned from the other, inapplicable regulations.  *Id.* at 56.

The court declines to do so.  Not only does the government's argument require a bigger leap than the court should take, case law supports plaintiffs' position.  In *Vermont Yankee,* the Federal Circuit affirmed the Court of Federal Claim's award of the utility's lobbying costs.  683 F.3d at 1346.   As such, it cannot be said that lobbying costs are unrecoverable as a matter of law.

The court in *Vermont Yankee*, however, reinforced the importance of demonstrating the basic requirement of foreseeability in order to recover such costs.  *Id.*  As the court has previously explained, in order to prove foreseeability, plaintiffs must establish that "the injury actually suffered [is] one of a kind that defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction."  *See Vermont Yankee*, 683 F.3d at 1344 (citing Joseph M. Perillo, 11 *Corbin on Contracts* § 56.7, at 108 (rev. ed. 2005)).   Here, the plaintiffs' unrebutted testimony demonstrates that lobbying costs were a foreseeable result of the government's breach.

First, Ms. Carla Pizzella testified that lobbying is common industry practice: "[A]nybody who stores nuclear fuel on their site lobbies to stay attune [sic] of recent developments and disposition issues related fuel." Tr. at 274:14-17 (Pizzella).  If all utilities that store nuclear fuel, which is incidentally now all nuclear utilities in the country as a result of the government's failure to perform under the Standard Contract, engage in lobbying, certainly the government should have expected that the Yankees would do the same.

In addition, both Ms. Pizzella and Mr. Wayne Norton testified that lobbying is, in large part, a result of the constantly shifting regulatory landscape.  Ms. Pizzella explained: "[W]e have fuel on site and we are constantly seeking information relative to perhaps interim fuel storage solutions that industry may have out there; being apprised of new technologies, advances; new governmental

33

regulations and rules associated with spent fuel.  That's why we lobby."  *See* Tr. 275:7-13 (Pizzella).  And Mr. Norton added:

> [W]e are constantly faced with changes in the regulatory landscape that affect the ultimate cost and requirements at our site, be it levels of security, heightened levels of security with the termination of the Yucca Mountain project, and the posture with the industry that long-term on-site storage for longer periods of time satisfies the requirements for, you know, the NRC's requirements for assurance, waste confidence.

Tr. at 281:8-16 (Norton).  In other words, the necessity of lobbying is a result of the government's own regulatory actions.  As such, the government is not in a position to claim that lobbying efforts were unforeseeable.

The government's breach was also a substantial factor causing Plaintiffs' to incur lobbying costs.  The costs claimed include only amounts incurred after decommissioning.  Tr. at 131:19-20 (Smith) ("Yes, all the lobbying costs in the damage submittal are post-decommissioning costs.").  Had the government performed under the contracts, the utilities would have ceased all lobbying efforts once each plant was decommissioned, and would have not incurred any of the costs now claimed.  In fact, the sole reason that lobbying efforts have continued is because the utilities are forced to store SNF on site due to the government's breach.  Tr. at 275:22-276:3 (Pizzella) ("[I]f the government was to make certain changes to the rules and regulations associated with spent fuel, that could cost the Yankees a lot of money given that we are storing fuel for an indefinite period of time at this point.  So with that we feel lobbying is a worthwhile effort *and only entertained because we have fuel on site*.") (emphasis added).  Therefore, the government's breach is the legal cause of plaintiffs' damages.

Because the lobbying efforts were both foreseeable and caused the government's breach, plaintiffs are entitled to recover these costs.

## V.      Litigation Costs

Prior to constructing its ISFSI, Connecticut Yankee was required to obtain a building permit from the Town of Haddam, but the town resisted granting the

permit, citing local zoning regulations.  *See* Tr. at 260:22-261:4 (Pizzella).   The town ultimately granted the permit, but only after the parties began litigation.  *See* Tr. at 261:7-22 (Pizzella).  Connecticut Yankee now seeks to recover the $685,895 it spent to obtain the permit.  *See* Doc. 58 at 11.

The government argues that plaintiffs are not entitled to recover these costs because they were not foreseeable or caused by the government's breach.  *See* Doc. 112 at 51. The court disagrees.   The court has previously held that ISFSI construction was reasonably foreseeable, and Federal Circuit affirmed this conclusion.  *Yankee Atomic*, 73 Fed. Cl. at 267 (concluding that "absent DOE performance the need to spend substantial sums for additional at-reactor storage was reasonably foreseeable at the time of contracting"); *id.* at 288 ("The court finds that substantial SNF . . . dry storage costs were reasonably foreseeable to DOE, the breaching party at the time of contracting.");  *Yankee Atomic*, 94 Fed. Cl. at 710-711 (holding that "[i]n [the] non-breach world, the Yankees' dry storage costs would have been zero because dry storage would not have been built," and noting that the Federal Circuit affirmed the "reasonableness and foreseeability" of the dry storage costs in *Yankee Atomic Elec. Co. v. United States*, 536 F.3d 1268 (2008)).

The government cannot reasonably claim that it did not foresee that a utility may encounter difficulty with building long-term storage for SNF.  As the court has previously noted, nuclear fuel storage is inherently a sensitive issue, implicating concerns of "severe potential health hazard[s]" and "complex technical problems."  *Yankee Atomic*, 73 Fed. Cl. at 253 (citations omitted).  This was, after all, the reason that the government entered into the Standard Contract to begin with.  *See id.* at 255 (noting that "Congress recognized that SNF was a national health and safety concern, that the disposal of nuclear waste was a federal responsibility" in passing the Nuclear Waste Policy Act, under which the Standard Contract was developed).  It is a logically foreseeable result that building storage for material that implicated severe potential health hazards may encounter resistance.  In fact, the government's own trouble with securing storage is the reason it breached its contract with Connecticut Yankee in the first place.  And because foreseeability does not require the foresight of a specific injury, the court holds that Connecticut Yankee has carried its burden.

The government's breach also clearly caused Connecticut Yankee to incur legal expenses.  The government argues that the Town of Haddam's decision to resist issuing the permit was an intervening cause that breaks the chain of legal causation.  *See* Doc. 112 at 52.  The government fails to recognize, however, that causation need not be so direct.  "The injury may be only indirectly produced but it yet must be capable of being traced to the breach with reasonable certainty." *Locke v. United States*, 283 F.2d 521, 526 (Ct. Cl. 1960).  Here, there is no question that the costs incurred from the Town of Haddam litigation flow directly, and dependently, from the government's failure to retrieve Connecticut Yankee's SNF.  *See* discussion of *Locke* and *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1071 (Fed. Cir. 2001), *supra* at section I.A.2.  Connecticut Yankee made no independent judgment to engage in litigation with the Town of Haddam—it was forced to find a place for its SNF, and to do so, was forced to pursue litigation by the town's intransigence.

Because the costs were both foreseeable and caused by the government's breach, Connecticut Yankee may recover its legal costs in an amount of $685,895.

## VI.   SUMMARY OF AWARDED DAMAGES

Considering the extensive audit process in which the parties participated, the testimony at trial, and the record as a whole, the court finds that the plaintiffs have established their recoverable damages to a reasonable certainty.  As such, plaintiffs are entitled to the following recoveries:

### A.   Connecticut Yankee

| | |
|---|---|
| Connecticut Yankee's total claimed damages: | $135,075,630 |
| Reduction for Bechtel allocation: | -$3,300,000 |
| Reduction for wet pool operations: | -$3,171,342 |
| Reduction for fuel characterization: | -$249,934 |
| Reduction for damaged fuel/reconstitution: | -$420,241 |
| Reduction for pool clean-up: | -$494,361 |
| Reduction for underwater camera/lighting: | -$81,659 |
| Reduction for crane upgrades and repairs: | -$1,020,520 |
| Total recovery: | $126,337,573 |

**B.     Yankee Atomic**

| | |
|---|---|
| Yankee Atomic's total claimed damages: | $76,578,844 |
| Reduction for fuel characterization: | -$2,901,797 |
| Reduction for damaged fuel/reconstitution: | -$369,518 |
| Total recovery: | $73,307,529 |

**C.     Maine Yankee**

| | |
|---|---|
| Maine Yankee's total claimed damages: | $35,049,366 |
| Addition for avoided wet pool costs: | +$1,646,180 |
| Reduction for damaged fuel/reconstitution: | -$895,191 |
| Reduction for pool clean-up: | -$39,363 |
| Total Recovery: | $35,760,992 |

The court notes that in calculating the damages, the initial figures were taken from the Joint Status Report filed on August 29, 2011.  *See* Doc. 58.  Those figures were then modified according to the changes noted in the Plaintiffs' Post-Trial Brief.  *See* Doc. 111.  Because there was no final, joint filing agreeing on the contested amounts, the court will allow the parties **fifteen days from the date of this Opinion** to file any corrections each deems appropriate.  A joint filing is preferred, and any suggested changes must be calculated according to the conclusions in this order.  Once any such submissions are considered, the court will enter final judgment.

In addition, the court has filed this Opinion under seal in the event that some information contained herein remains sensitive.  The parties are directed to submit any proposed redactions within **fifteen days from the date of this Opinion**.

All motions pending on docket numbers 1:07-cv-875, 1:07-cv-876, 1:07-cv-877 that are not otherwise addressed herein, are hereby **DENIED AS MOOT**.

**SO ORDERED.**

<u>s/ James F. Merow</u>
James F. Merow
Senior Judge